**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**J6ERS WERE DESTROYED
BY WEAPONIZATION,**
an Unincorporated Association,
        Plaintiff,

v.                                                      Civil Action No. 1:26-cv-2082

**TODD BLANCHE**, in his
Official Capacity as Acting
Attorney General of the United States,
        Respondent.

## <u>PETITION FOR WRIT OF MANDAMUS</u>

### INTRODUCTION

1.      On June 7, 2026, President Donald J. Trump was asked by the press whether

January 6 defendants who pled guilty should be compensated. He answered:

> You know why they pled guilty? Because they told them they were going to jail
> for 15 years if they didn't. They pled guilty because they were frightened. The
> people were destroyed by dirty cops and by weaponization. Many of those
> people should be compensated.[1]

2.      The President is correct. Guilty pleas have long ceased to be voluntary confessions

of truth. More often than not, a guilty plea is a government scripted recitation of lies offered by a

frightened and broken defendant. Prosecutors have unbridled and unchecked power that allows

them to use coercive tactics that leave criminal defendants with no meaningful choice but to

surrender to the government or else face an unfair process that is itself the punishment. This should

concern every American, regardless of political views.

3.      To avoid the inconvenience of trials, prosecutors can extract guilty pleas through

pretrial detention, threats of additional charges, and harassment of family members. Over the years,

---

[1] https://www.youtube.com/watch?v=eCryZlXg7Uk.

many defendants who maintain their innocence have confessed under duress to crimes they did not commit to avoid punishment for asserting their constitutional right to trial.

4.      Former prosecutor Harvey Silverglate, in his book *Three Felonies a Day: How the Feds Target the Innocent*, argues that federal prosecutors have engaged in the Stalinist tactic of "show me the man and I'll find you the crime" by charging Americans with unbeatable vague and overbroad criminal statutes and regulation, and then using prosecutorial force to extract guilty pleas.  These practices are widely known but taken for granted as a necessary part of our "justice system." But it is neither necessary nor just. As a victim of weaponization, President Trump is aware of these unfair tactics and is calling them out.

5.      The prosecution of the J6ers was the largest-scale prosecution in American history. Systemic abuse was on display for four years with impunity and without restraint. This lawsuit challenges the Department of Justice to examine some of its most pernicious tactics, cure these abuses, and begin restoring the reputation of the Justice System.

6.      DOJ has publicly acknowledged that the J6ers were victims of "DOJ's weaponization under the Biden administration," and referring to the J6ers specifically, DOJ has publicly committed to doing everything in its power "to make whole those who were persecuted for political purposes."



7.      The Plaintiff in this case, "J6ers Were Destroyed By Weaponization," is an organization of January 6 defendants who were coerced into pleading guilty despite maintaining their innocence. This Complaint seeks a writ of mandamus directing the Acting Attorney General Todd Blanche, or his successor, to revoke all guilty pleas that federal prosecutors secured through coercion. The Complaint identifies four principal coercive tactics applied across these cases: (1) the threat of up to 25 years in prison for even peaceful conduct via two overbroad felony statutes; (2) the use of pretrial detention to punish and pressure defendants; (3) the deliberate selection of the District of Columbia, where a fair trial was effectively impossible; and (4) the imposition of disproportionately harsh sentences for those who went to trial. This list is non-exhaustive.

8.      If successful, this lawsuit will serve as a starting point to identify and investigate other cases of abuse and to emancipate Americans of all political views from the horrifying fate of false imprisonment, lifelong branding as felons, chronic unemployment, and perpetual crushing restitution. Weaponized government is an avoidable scourge that leaves a wake of broken families, traumatized children, poverty, depression, substance abuse, and even suicide. Americans have enough problems. This lawsuit calls on the Department of Justice to make reforms that are long overdue.

## **PARTIES**

**Plaintiff**

9.      "J6ers Were Destroyed By Weaponization" (hereinafter "Plaintiff" or "the Organization") is an unincorporated association whose members are individuals prosecuted in connection with January 6, 2021, that were coerced into plea agreements under the threat of: charges under 18 U.S.C. § 1512(c)(2) and/or 18 U.S.C. § 231(a)(3); pretrial detention; unfair trial in the District of Columbia; unprecedented prison sentences; and other tactics employed by the

DOJ to frighten, intimidate, and coerce J6ers into accepting plea deals that they otherwise would have rejected.

**Respondent**

10.     Respondent Todd Blanche is the Acting Attorney General of the United States. He is the senior law enforcement officer of the United States government, vested with supervisory authority over all federal prosecutions and the administration of federal criminal justice. He is sued solely in his official capacity.

11.     Respondent is uniquely situated to understand the conduct complained of herein. He served as a federal prosecutor in the Southern District of New York at the same time that office prosecuted of Dinesh D'Souza—a prosecution President Trump subsequently pardoned. Respondent also defended President Trump as the President's private attorney against 34 criminal counts in New York. Though the President was convicted on all counts, the American People soundly rejected the fairness of those charges by electing a "convicted felon" as the 47th President of the United States.

12.     Respondent should also be deeply familiar with January 6 prosecutorial misconduct from his representation of former President Trump in the federal January 6 prosecution, Case No. 1:23-cr-257 (D.D.C.).

**JURISDICTION AND VENUE**

13.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1361 (mandamus); 28 U.S.C. § 1651 (All Writs Act); 28 U.S.C. § 1331 (federal question); and the Fifth Amendment to the United States Constitution.

14.     Venue is proper pursuant to 28 U.S.C. § 1391(e). Respondent is an officer of the United States sued in his official capacity. A substantial part of the events giving rise to these

claims—the charging decisions, plea coercions, venue denials, and detention conditions— occurred in this District.

## THE MANDAMUS STANDARD

15.     A writ of mandamus under 28 U.S.C. § 1361 is appropriate when: (1) the plaintiff has a clear right to the relief sought; (2) the respondent has a plain, non-discretionary duty to perform the act in question; and (3) no other adequate remedy at law is available. *Baptist Mem'l Hosp. v. Sebelius*, 603 F.3d 57, 62, 390 U.S. App. D.C. 251 (D.C. Cir. 2010). All three conditions are satisfied here.

16.     The members of the Organization have a clear Fifth Amendment due process right to be free from the ongoing legal consequences of plea agreements procured by "actual or threatened physical harm or by mental coercion overbearing the will of the defendant." *Brady v. United States*, 397 U.S. 750 (1970).

17.     The Acting Attorney General has a non-discretionary duty to ensure that federal prosecutions comply with the Constitution, codified in 28 U.S.C. §§ 516, 530B, and the Department's own Principles of Federal Prosecution.

18.     *Fischer v. United States*, 603 U.S. ___ (2024), definitively established that the primary felony charge deployed against hundreds of January 6 defendants—18 U.S.C. § 1512(c)(2)—was legally wrong.

19.     The existence of a final Supreme Court ruling invalidating one of the central charging theories, combined with the documented evidence of systemic detention, use of force in predawn raids, coercion and selective politically motivated prosecution, creates a non-discretionary duty to review the plea agreements that theory produced.

20.     No adequate remedy otherwise exists: the vast majority of defendants who have completed their sentences cannot pursue direct appeals. Presidential pardons, while granted to some, are not a systemic legal substitute for the review and vacatur this complaint seeks. The scale and uniformity of the coercive system—documented by the Acting United States Marshal, by members of Congress, by the D.C. City Council, by federal district judges, and by hundreds of defendants—constitutes the kind of extraordinary circumstance mandamus was designed to address.

## STATEMENT OF FACTS

21.     The coercion that pervaded the January 6 prosecutions is documented in thousands of public court filings. There are hundreds of witnesses who can testify directly to the coercive conditions they experienced.

22.     The Department of Justice employed many of the tactics that are standard tools for extracting guilty pleas from resistant defendants, and it deployed every one of them against January 6 defendants without restraint or guardrail. There was no internal check. All of the stops were pulled out.

23.     This complaint documents four of the common coercive mechanisms. But they are not the only ones. Additional coercive tactics include the government's practice of conducting pre-dawn raids on the homes of January 6 defendants: arriving with tactical teams and weapons drawn in the early morning hours, in front of spouses, children, and neighbors, for defendants accused of non-violence, often only misdemeanors, and that posed no danger or flight risk. These raids were designed not to secure dangerous fugitives but to terrify ordinary people into compliance.

24.     Witnesses can also attest to the government's use of other tactics, including but not limited to threatening to investigate and charge the friends and family members of defendants who

refused to cooperate or plead, and aggressive propaganda campaigns to systematically dehumanize the group and individual defendants that amounted to nothing short of severe mental coercion.

25.     One of the worst tactics was the use of "shock and awe" predawn raids by the FBI, including large swat teams with long guns drawn, and military vehicles. These raids were against Americans with no criminal records who never engaged in violence, who would have surrendered. The purpose of the raids was to stun and traumatize defendants and their families, including young children. The defendants were manhandled, zip tied, dragged out into the street in their underwear in full view of their neighbors, separated from their families, and detained in holding cells for hours and sometimes days. During that time, J6ers feared the worst. When the DOJ approached them after hours or days in a cell after the most harrowing and traumatizing experience of their lives, many of them were so frightened they were prepared to sign whatever was put in front of them to make the nightmare end and return to see their families. They were led to believe, and even expressly told, that if they did not plead guilty they would be sent away for years.

26.     These additional coercive tactics are well documented and will be presented as this litigation proceeds.

27.     This complaint focuses on four coercive mechanisms that are each independently documented by the public record and, in combination, created a system of compulsion that left January 6 defendants with no meaningful choice but to plead guilty.

28.     The first is the charging of two catch-all felony statutes—18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 231(a)(3)—that together converted every misdemeanor January 6 case into a potential exposure of twenty-five years in federal prison. After three and a half years of prosecutions and convictions under the 1512 charge, the Supreme Court would ultimately confirmed that the charge was legally invalid, and never should have been brought to begin with.

The 231 charge had never been used against non-violent protesters before or since. As explained below, it was obviously unconstitutional. However, the legal process moved to slowly to allow the Supreme Court a chance to hear it.

29.    The second coercive tactic is the threat of, or actual confinement in, the D.C. Jail. facility The Acting United States Marshal found the DC Jail to be in systemic violation of federal detention standards. A federal judge held the Jail in contempt and referred it for a civil rights investigation. A D.C. task force reported an average of one inmate death per month. Yet, the DOJ, knowing all of this, did not conduct a civil rights investigation and continued to send January 6 defendants there, to suffer pretrial in conditions amounting to inhumane treatment under domestic and international law.

30.    The third coercive tactic was the insistence that the J6ers be tried in D.C. where J6ers had a 0% chance of having a fair trial. Based on polling data, media saturation metrics, and a nearly 100% conviction rate for J6ers, any objective analysis leads to the conclusion that the judicial forum, like the jury pool, had prejudged the outcome.

31.    The fourth coercive tactic is the knowledge, confirmed by the documented sentencing records of co-defendants across dozens of cases, that pleading guilty could spare a defendant months or years in prison compared to the sentence that would follow conviction at trial—legally unjustifiable sentences far in excess of anything that had ever been imposed for comparable conduct on any other day in American history and that violated the Eighth Amendment for disproportionality. *Solem v. Helm,* 463 U.S. 277 (1983).

32.    This list of coercive tactics is not exhaustive, but these four mechanisms made the guilty pleas invalid as they created an actual threat of physical harm and severe mental anguish

that a reasonable person would not be able to withstand. President Trump said these defendants were frightened. The record proves he was right.

### SHOW ME THE MAN AND I'LL FIND YOU THE CRIME
### 18 U.S.C. § 1512(C)(2) AND 18 U.S.C. § 231(A)(3)

33.     Joseph Stalin's secret police chief, Lavrentiy Beria, is reputed to have said: "Show me the man, and I'll find you the crime." The statement captures the essence of a system in which guilt is predetermined, and the law is searched as an afterthought for a means of prosecution. In the January 6 prosecutions, the government found two charges vague enough to be applied to virtually any of the tens of thousands of Americans who were present at or near the Capitol that day: 18 U.S.C. § 1512(c)(2), the Enron-era evidence-tampering statute carrying twenty years; and 18 U.S.C. § 231(a)(3), the civil disorders statute carrying five years. Combined, they placed every defendant at theoretical risk of twenty-five years in federal prison. The statutes reach was so far and all encompassing, it included those who never entered the Capitol, never touched a police officer, committed no act more serious than walking on Capitol grounds, and even individuals who were not present in Washington, D.C. that day.

**34.**     This was not how these statutes had ever been used before January 6, 2021. As documented exhaustively in the DOJ's own statistical data, the concentration of these charges in the District of Columbia against January 6 defendants was without historical parallel. **Exhibit 1 and Exhibit 2.**

35.     Just a few months before January 6, 2021, and in the years that followed, across the country, left-wing protesters who stormed legislative buildings, blocked emergency responders, assaulted and obstructed law enforcement, set federal courthouses and police stations ablaze, and physically obstructed congressional proceedings were not charged with these statutes.

36.     Many January 6 defendants have stated publicly and will testify under oath that it was these two charges and the prospect of twenty-five years in federal prison that drove their decisions to plead guilty. They did not plead because they believed they were guilty of serious crimes. They did not believe that. They pled guilty because the DOJ used unlawful tactics to threaten them with actual physical harm in the form of unlawful detention and sentences so disproportionate that they violated the Eight Amendment's prohibition on cruel and unusual punishment. They pled guilty because, as President Trump correctly stated, they were frightened.

### 18 U.S.C. § 1512(c)(2): The Sarbanes-Oxley Obstruction Charge

37.     Section 1512(c)(2) of Title 18 provides that whoever "corruptly . . . otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so" may be imprisoned for up to twenty years.

38.     Section 1512(c)(2) was enacted as part of the Sarbanes-Oxley Act of 2002 ("SOX"), a statute whose full title announces its purpose: "An Act to protect investors by improving the accuracy and reliability of corporate disclosures made pursuant to securities laws, and for other purposes." SOX was Congress's direct response to the Enron accounting scandal and the revelation that Enron's outside auditor had systematically destroyed documents to impair federal investigations. SOX was "prompted by Enron's massive accounting fraud" and the need to address a specific loophole: Section 1512(b) covered document destruction only where the defendant had induced another person to do it. It did not cover document destruction carried out by the defendant acting alone. Senator Trent Lott explained its purpose was to "enact stronger laws against document shredding." The Senate Judiciary Committee report explained that it was meant to "close loopholes in the existing criminal laws relating to the destruction or fabrication of evidence and the preservation of financial and audit records."

39.    Someone at DOJ came up with a scheme to use this obscure obviously non-applicable statute about shredding corporate documents to convert every single January 6 misdemeanor case into a 20-year felony case.

40.    On June 28, 2024, the Supreme Court of the United States, in *Fischer v. United States*, 603 U.S. ___ (2024), rejected the government's interpretation of Section 1512(c)(2). Mere presence at the Capitol during the certification was insufficient to charge someone with Section 1512. The DOJ's sweeping theory that was applied to over 1,000 J6ers was wrong all along.

41.    Unfortunately, by the time the Justices issued their ruling it was too late for hundreds of defendants that had already pled guilty under the shadow of this invalid charge or who had been convicted at trial by judges and juries who applied the obviously incorrect law. Defendants had already served time in prison; many had even completed substantial years-long sentences. For them the Supreme Court's academic victory came too late. The damage—deprivation of liberty, physical torment, mental anguish, shattered livelihoods, destroyed families, and the accompanying carnage that comes with a federal felony indictment—was already done. Some Defendants even took their own lives because of the immense and unbearable pressure.

42.    During oral argument in *Fischer*,[2] Justices Thomas, Alito, and Gorsuch all expressed explicit skepticism that the government had selectively applied the Section 1512(c)(2) felony charge to January 6 defendants while declining to apply it to similarly situated defendants engaged in conduct that disrupted official proceedings. Justice Thomas questioned why the government had not applied Section 1512(c)(2) to protesters who had disrupted other official proceedings. Justice Alito pressed the government on whether its theory, applied consistently, would have swept in protesters from across the political spectrum. Justice Gorsuch noted the

---

[2] https://www.oyez.org/cases/2023/23-5572.

extraordinary breadth of the government's reading and its targeted application to a single class of politically defined defendants.

43.    The government's statistical data leaves no room for doubt that January 6 defendants were uniquely targeted with the 1512 charge. Of 324 total defendants charged with Section 1512(c)(2) nationally from January 6, 2020, through January 31, 2023, 265—more than 81 percent of the entire national total—were charged in the District of Columbia alone, virtually all arising from January 6, 2021. The District of Oregon, where rioters attacked and set ablaze the Hatfield federal courthouse over weeks of sustained violence, had zero Section 1512(c)(2) charges, even though sieging and setting a courthouse on fire undoubtedly caused some obstruction to the court's official proceedings. The District of Minnesota, where an entire police precinct burned to the ground and $12 million in damage was caused to law enforcement infrastructure alone, had zero 1512(c)(2) charges. Only 23 of the remaining 93 federal districts had any Section 1512(c)(2) charges at all, and no district outside D.C. had more than six. **Exhibit 1.**

44.    The pattern of selective non-application of Section 1512(c)(2) to comparably situated protesters—occurring concurrently with January 6 prosecutions—removes any possibility that the disparity was accidental.

45.    On March 7, 2024—while hundreds of January 6 defendants were being prosecuted under Section 1512(c)(2) for a twenty-year felony—Capitol Police arrested Steven Nikoui for disrupting the State of the Union address. According to the New York Times, Capitol Police confirmed this was resolved with a $50 fine, the typical punishment for obstructing a congressional proceeding.[3] That same day, a J6er in California was arrested and detained in jail for only the misdemeanors and the 1512 charge.

---

[3] https://www.nytimes.com/2024/03/08/us/politics/abbey-gate-yelling-state-of-union.html.

46.     On October 18, 2023, hundreds of pro-Palestinian protesters stormed and flooded the Cannon House Office Building, ignoring Capitol Police's express warnings. Among them was Huwaida Arraf, who disrupted a Senate Foreign Relations Committee hearing on foreign aid, shouted down speakers, and physically resisted multiple Capitol Police officers.[4] She boasted about her conduct on social media[5] and posted video of herself resisting arrest. That day Capitol Police warned members of Congress to shelter in place. The DOJ did not charge Arraf under Section 1512(c)(2). According to the federal docket, she was not charged at all.

47.     On September 30, 2023, while January 6 protestors were being prosecuted and threatened with the 1512 charge, United States Representative Jamaal Bowman pulled a fire alarm in the Cannon House Office Building minutes after members of the House were called to vote on a critical government-funding measure. The building evacuated for ninety minutes. The congressional vote was delayed. Capitol Police established a command post. Video evidence showed Bowman removing posted warning signs on a building door before pulling the alarm and then passing three uniformed Capitol Police officers without warning them, allowing the evacuation to proceed when he could have stopped it. Capitol Police found probable cause to believe he willfully gave a false fire alarm. By the DOJ's own legal theory as applied to January 6 defendants, Representative Bowman's conduct was textbook Section 1512(c)(2) behavior: a willful act that obstructed an official congressional proceeding. He was permitted to plead guilty to a single misdemeanor in D.C. Superior Court and pay a $1,000 fine.[6] No federal charge. No twenty-year felony.

---

[4] https://x.com/AMPalestine/status/1714672366792347649.
[5] https://x.com/huwaidaarraf/status/1719355985272115673.
[6] https://apnews.com/article/bowman-fire-alarm-house-shutdown-vote-misdemeanor-c32d97c1d86f2f1769596613d29678f3.

48.     On March 30, 2023, Democratic members of the Tennessee state legislature and a group of outside protesters invaded the Tennessee House chamber and disrupted official legislative proceedings.[7] The Republican House Speaker described the episode as an "insurrection." Not a single peaceful protester was charged with a twenty-year federal felony.

49.     For J6ers, it was maddening to watch on television and to read in the news about individuals who engaged in conduct that was far worse than anything they committed, and yet those individuals were not targeted with the same federal laws. It was as if there was a special law that only applied to them. The conclusion that the federal government was targeting them for political reasons was inescapable.

50.     The coercive effect of the Section 1512(c)(2) charge on January 6 defendants' plea decisions cannot be overstated. Every defendant charged with this count faced the prospect of twenty years in federal prison. Combined with the five years under Section 231(a)(3) that will be discussed below and the additional misdemeanor exposure, the total theoretical sentencing exposure was akin to a life sentence for misdemeanor conduct.

51.     The D.C. Circuit Court of Appeals' dissenting judge noted in the *Fischer* litigation that the DOJ's theory "supercharged" every underlying misdemeanor act into a twenty-year felony. The purpose of the supercharging was to exert unimaginable pressure to coerce guilty pleas.

52.     Members of the Plaintiff organization stand prepared to testify that the 1512 charge was one of the, if not the most, decisive factor in their decisions to plead guilty. Their testimony will establish that these were not voluntary admissions of guilt. They were driven by the existential threat of a charge that carried with it what was effectively a life sentence.

---

[7] https://newsroom.ap.org/editorial-photos-videos/detail?itemid=dc5c5384fe174d4cacbce207ebb69d0e&mediatype=video.

53.     The DOJ prosecutors in the January 6 cases wielded Section 1512(c)(2) as an instrument of coercion. The prosecutors understood that the charge rested on a flimsy doomed legal theory that would inevitably be overturned. Despite this knowledge, they used the threat of decades in prison for misdemeanor conduct to pressure defendants they knew to be innocent of the charge to surrender and plead guilty. Knowing these defendants maintained their innocence, the government prosecutors drafted false statements of facts for the defendants to sign at proverbial gunpoint.

54.     Ironically, when prosecutors used false and legally overbroad charges to coerce defendants to sign false statements of facts under oath in official proceedings, they were the ones who corruptly influencing those proceedings in violation of Section 1512.

**18 U.S.C. § 231(a)(3): The Civil Disorder Statute**

55.     18 U.S.C. § 231(a)(3) provides that anyone who "commits or attempts to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder" may be imprisoned for up to five years.

56.     According to the statute "any act," whether actually committed or merely attempted, if that act obstructs, impedes, or interferes with law enforcement during a civil disorder, the defendant can be convicted of a felony carrying five years in prison.

57.     It is an unbeatable charge because, according to the January 6 jurisprudence, simply standing by peacefully was an "act" that violates the statute. The mere presence in the crowd caused the officer to work that much harder to perform his duties, so the peaceful bystander was causing an obstruction. Courts in other jurisdictions had long held that the statute required a violent act, but the D.C. court disagreed.

58.     The statute was enacted in 1968, at the height of the civil rights movement and urban unrest. Its legislative history makes plain that it was a law conceived to suppress protest against the government during the civil rights movement.

59.     Section 231(a)(3) was used against political activist Abbie Hoffman in connection with the 1971 May Day protests in Washington, D.C.

60.     Ironically, in the lobby of the E. Barrett Prettyman Federal Courthouse in Washington, D.C.— the courthouse where the January 6 trials were conducted—there is an exhibit commemorating the Mayday protests of 1971 and their aftermath. The exhibit is part of a series of displays extoling the great accomplishments of the D.C. Court. The Mayday exhibit praises the court for protecting the First Amendment against government infringement. The display reads:

> **The Mayday Protestors 1971-1981:** To show their disagreement with the war effort in Vietnam, thousands of protestors filled the streets. Between April 22 and May 6, 1971, the police arrested 14,517 persons typically on charges of disorderly conduct. The government held more than 1,500 of these protestors at the Washington Coliseum. Of those charged, 871 proceeded to full trial on the merits. The Court of Appeals eventually ordered the District Court to enjoin prosecutions not supported by specific evidence — the vast majority of cases. ***The District Court later ordered that the arrest records of the thousands of protestors be expunged.*** In 1976, a class action lawsuit was filed on behalf of 1,200 arrested protestors against former Attorney General John Mitchell, former Capitol Police Chief James Powell, the District of Columbia, and others, alleging that the officials violated their First Amendment rights. In 1981, the parties settled.

(emphasis added).

61.     This exhibit hangs in the lobby of the court that ordered the expungement of records of Abbie Hoffman and his fellow protestors, presumably including Hoffman's 231 charge. The government compensated those protestors.

62.     The statute should have been found unconstitutional. In 1987, in a case called *Houston v. Hill*, the Supreme Court invalidated a nearly identical municipal ordinance making it unlawful to "in any manner oppose, molest, abuse or interrupt any policeman in the execution of his duty." In invalidating the statute as overbroad, Justice Brennan wrote:

[The] ordinance criminalizes a substantial amount of constitutionally protected speech, and accords the police unconstitutional discretion in enforcement. The ordinance's plain language is admittedly violated scores of times daily, yet only some individuals — those chosen by the police in their unguided discretion — are arrested. Far from providing the "breathing space" that "First Amendment freedoms need . . . to survive," the ordinance is susceptible of regular application to protected expression.

63.     In the January 6 context, the D.C. judges distinguished Section 231 from the ordinance at issue in *Houston v. Hill,* because, while it's unconstitutional to prohibit "opposing, molesting, abusing, or interrupting" police, it is constitutional to prohibit "obstructing, interfering, and impeding."

64.     But just as the D.C. Court got the 1512 wrong, it also got the 231 wrong. The statute is in principle no different from the ordinance ruled unconstitutional by the Supreme Court in 1987. Both are subjected to the "unguided discretion" of the prosecutor. Unfortunately, or fortunately, President Trump ended the January 6 prosecutions before the 231 could make its way to the Supreme Court.

65.     The DOJ's own statistical data confirms the selective application of the 231 charge, just as it does the 1512 charge. **Exhibit 2**. Of 269 defendants charged nationally with 231(a)(3) from January 6, 2020 through January 31, 2023, 206—more than three-quarters of the entire national total—were charged in the District of Columbia, virtually all arising from January 6, 2021. Eighty percent of the remaining 93 federal districts had zero 231 charges.

66.     There were no charges of 231 against the BLM rioters in Washington, D.C. in 2020, just months before January 6, 2021. The BLM rioters were so threatening that the President of the United States was forced to retreat to the protective bunker below the White House, something that had not occurred since September 11, 2001.[8]  The rioters also burned a historic church. A Metro Police Officer who was on duty for both J6 and the BLM riots believed the DOJ did not

---

[8] https://www.cnn.com/2020/05/31/politics/trump-underground-bunker-white-house-protests.

show the same level of zeal in its efforts to investigate and prosecute rioters associated with George Floyd protests, and he believed this was politically motivated. He also noted how he had been assaulted during one George Floyd protest and suffered an injury to his eye in which he thought he might go blind, but the DOJ was not interested in those riots.

67.    As one example, during one of the many days that BLM rioted in D.C. for George Floyd in June of 2020, Jason Charter was charged with destroying not one but two historic statues,[9] including damaging and attempting to tear down the Andrew Jackson statute in Lafayette Square, and pouring flammable liquid on and setting fire to the Albert Pike Memorial Statue that stood[10] within an area subject to the very same restrictions that J6ers were charged with entering. Not a single January 6 defendant is accused of desecrating one of the historic statues or paintings in Statutory Hall, the Rotunda, or elsewhere in the Capitol, the Capitol grounds, or anywhere in Washington, D.C. It is hard to imagine the sentence that would have been imposed if one of the January 6 defendants had done so.

68.    During the destruction of the Andrew Jackson Statue, BLM protestors obstructed law enforcement by standing around the statute with arms interlocked to create a blockade preventing the police from approaching the statue.

69.    None of the BLM rioters were charged with the 231 charge, though all of them could have. Charter was set free while his case was pending, unlike J6ers who were rounded up from around the country and held pretrial in the D.C. Gulag. While awaiting his sentencing, Charter was arrested not once but twice for assault, including the assault of a United States Park Police officer while engaged in the performance of official duties. Charter allegedly grabbed an

---

[9] https://www.justice.gov/usao-dc/pr/man-charged-federal-court-attempting-tear-down-statue-andrew-jackson-lafayette-square.

[10] The BLM protestors tour down and set fire to the statute, but it was refurbished and reinstalled five years later, in 2025. https://en.wikipedia.org/wiki/Albert_Pike_Memorial.

officer's tactical vest while officers were arresting another individual. Any J6er accused of anything approaching that conduct was convicted and sentenced to years in prison. But for two assaults and destroying two statues, the government allowed Charter to plea to a single misdemeanor and asked the court to impose a sentence of 30 hours of community service, 45 days of home detention, a $500 fine, and $2,600 restitution. The court ultimately sentenced him to 60 days house arrest, no prison time, and no community service.

70.    The comparison with other districts shows the same pattern: In Minneapolis, after the George Floyd riots of 2020, the Government only charged a single individual with 18 U.S.C. § 231(a)(3). The rioters set fire to and looted a police station. But by the number of charges of 231, it seems the DOJ did not consider burning the police station to be an obstruction, interference, or impediment to law enforcement.

71.    During the Minneapolis George Floyd riots, CNN provided live coverage as the cheering mob gathered and hurled fireworks at the Third Precinct Police Station as it burned in flames. The rioters prevented law enforcement and first responders from putting out the fires, in clear violation of the 231 charge. CNN's law enforcement expert reported:

> Police had made a calculated decision that they are not going to enforce what we are seeing behind us. There is fire being set to the police department as you can hear what's going on behind us, there are fireworks going off, people climbing up the side of the building. They made the calculated decision that they are not going to stop people from doing that. I think the reason is they know that any type of police presence here is going to be met with aggression and agitation by this crowd that is clearly unhappy. We were just three blocks away at a financial institution that was on fire. The fire department was there but they were keeping a distance, they were not moving in to fight this fire, not wanting to put themselves in jeopardy or danger from this crowd that was clearly agitated. ...They are going to let this building burn…They know the decision right now is you lose a building, or you lose lives, potentially.[11]

---

[11] https://www.youtube.com/watch?v=505lAvIGCj0.

72.    Branden Michael Wolfe was at the Third Precinct while it was burning. He pushed a flaming barrel into an existing fire at the precinct entrance to accelerate it. He then entered the burning building and stole a police vest, duty belt, handcuffs, earpiece, baton, knife, riot helmet, pistol magazine, police radio, police overdose kit, uniform name plates, and ammunition. He was arrested wearing the stolen police vest. He had a prior criminal history that included domestic abuse incidents directed at the mother of his child, and he was on probation when he committed the offense. Yet, astonishingly, Wolfe was not charged with Section 231, because apparently burning a police station and looting ammunition and weapons is not an obstruction to law enforcement.

73.    In Atlanta CNN reported in real time as BLM rioters attacked the CNN Atlanta office, obstructing law enforcement that are seen absorbing a potentially lethal attack to protect the civilians inside the building. Dozens of protestors are seen on camera facing off to a line of police officers forming a protective line using riot shields. The protestors can be seen hurling projectiles including explosives, smashing windows, and committing other acts of violence, threatening the lives of police and others trapped inside.[12] Yet the DOJ brought exactly zero cases of 18 U.S.C. § 231(a)(3) in the Northern District of Georgia after the riots.

74.    No district outside of the District of Columbia had more than 6 charges of 18 U.S.C. § 231(a)(3) during the time period that saw Black Lives Matter riots in cities across the country, except for Oregon, where the riots in Portland lasted weeks and a federal courthouse was attacked and set on fire. The DOJ only brought 19 charges under Section 231, which resulted in only 2 convictions.

---

[12] https://www.youtube.com/watch?v=Yve9DhT8Nt4.

75.    During the Portland riots, federal law enforcement officers were subjected to physical assault, threats, aerial fireworks including mortars, high intensity lasers targeting officer's eyes, thrown rocks, bottles and balloons filled with paint, and vulgar language from demonstrators while performing their duties.

76.    On July 11, 2020, two weeks into the Portland riots, Edward William Carubis assaulted federal law enforcement officers by shining a laser into the eyes of at least one federal officer, causing damage to the officer's vision. Carubis was not charged with 18 U.S.C. § 231(a)(3), even though the FBI affidavit expressly states that his actions impeded and interfered with police during the civil disorder. Carubis spent three days in jail following his arrest, was offered and accepted a plea deal to a single misdemeanor, and he was sentenced to time served with no additional probation or supervised release and a $25 fine.[13] It is unimaginable what the charges and sentence would have been if a J6er had done something similar.

77.    Also in Portland, Rowan Olsen impeded and interfered with FPS and USMS during the performance of their official duties in protecting federal property, namely the Mark O. Hatfield Federal Courthouse. Olsen entered onto the federal property and used his body to hold a door closed, preventing the officers from exiting the building. These actions contributed to the glass door breaking, injuring a Deputy US Marshal, and compromised the security integrity of the Federal Courthouse. With the door broken, officers were subject to projectiles from demonstrators, to include a mortar firework which detonated amongst them. Officers used a riot shield and their bodies to block the open doorway for approximately six hours until the demonstrators were dispersed, and the broken door was replaced with plywood. Incredibly, Olsen was not one of the 19 rioters charged with the 231 charge for obstructing law enforcement, even though he quite

---

[13] https://www.oregonlive.com/crime/2023/01/man-who-pointed-laser-at-officers-outside-portlands-federal-courthouse-gets-time-served.html?outputType=amp.

literally used his body to obstruct and impede officers from exiting a burning building during a civil disorder. Instead, he was charged with three class C misdemeanors, all of which were ultimately voluntarily dismissed by the DOJ for no apparent reason.

78.     By September 8, 2021, according to one report, DOJ charged less than 40 individuals with crimes for the weeks long riots in Portland that were far worse in every respect and by many magnitudes than the 3-hour incident at the Capitol on January 6, 2021. By the same date, DOJ had already arrested over 600 J6ers, and would ultimately arrest almost 1,000 more. Of those charged for crimes in Portland, most charges were dismissed, others pled to misdemeanors without prison time, and the few charged and convicted with felonies received sentences that were far lighter than what they would have received had they engaged in the same conduct on January 6, 2021.

79.     The selective prosecution was further evidenced by the way that the DOJ advocated for leniency for BLM protestors, including approaching the line of justifying their behavior. In arguing for leniency for Brandon Wolfe who set fire to the Third Precinct, the DOJ noted that "Importantly, much of the anger and pain of protesters was directly aimed at the Third Precinct — as a building and as a symbol — because all four officers associated with the death of George Floyd were stationed at the Third Precinct." For Brandon Wolfe, the DOJ asked for a sentence of 41 months, which in the BLM context, the government characterized as a "significant sentence." Compare Brandon Wolfe who set a police station on fire and stole ammunition and weapons with J6er Richard Barnett who put his feet up on a staffer's desk and "stole" a dirty crumpled envelope. Barnett was charged with Section 1512 and 231, and DOJ sought 87 months in prison. Wolfe only served 27 months in prison, less than what some J6ers served pretrial.

The most egregious evidence of DOJ's bias in prosecution was the case of Montez Terriel Lee. According to DOJ, Lee set fire to a small business in Minneapolis during the riots—a fire that caused the death of a man trapped inside the building. Lee received a sentence of 120 months—ten years—for causing a death. J6er Enrique Tarrio was sentenced to 22 years, and he was not even present at the Capitol. The DOJ went to extraordinary lengths to place Montez Terriel Lee's conduct in favorable moral context. The DOJ's sentencing memorandum stated:

> [T]his is an extraordinary case. The United States therefore seeks a downward variance, and a sentence of 144 months. Mr. Lee's motive for setting the fire is a foremost issue. Mr. Lee credibly states that he was in the streets to protest unlawful police violence against black men, and there is no basis to disbelieve this statement. Mr. Lee, appropriately, acknowledges that he 'could have demonstrated in a different way,' but that he was 'caught up in the fury of the mob after living as a black man watching his peers suffer at the hands of police.' As anyone watching the news world-wide knows, many other people in Minnesota were similarly caught up. There appear to have been many people in those days looking only to exploit the chaos and disorder in the interests of personal gain or random violence. There appear also to have been many people who felt angry, frustrated, and disenfranchised, and who were attempting, in many cases in an unacceptably reckless and dangerous manner, to give voice to those feelings. Mr. Lee appears to be squarely in this latter category. And even the great American advocate for non-violence and social justice, Dr. Martin Luther King, Jr., stated in an interview with CBC's Mike Wallace in 1966 that 'we've got to see that a riot is the language of the unheard.' Lily Rothman, What Martin Luther King Jr Really Thought About Riots, Time Magazine (2015).
>
> In light of these circumstances, the analysis of the Guidelines does not appear appropriate. Consider, for example, that both assault with intent to commit murder and attempted murder have a base offense level of 33. U.S.S.G. § 2A2.1(a). This means that, if Mr. Lee had assaulted Mr. Stewart with the intent to kill him, his Guideline range would be 135–168 months' imprisonment — about ten years less than the current range. But the criminal culpability, and the danger to society, that an attempted murderer poses appears much greater than the culpability and danger of Mr. Lee.

The government compared Montez Terriel Lee to Martin Luther King Jr. It sought a sentence below the guideline range. It argued that a man who burned a building that killed another human being was engaged in a morally understandable, if not justifiable, form of political protest. The government had to qualify that he was not as much of a danger to society as other criminals. Unlike

Page 23 of 42

J6ers, Montez Terriel Lee is not a threat to the "fabric of democracy." This egregious display exposes the DOJ's animus towards J6ers and it's favoritism towards favored protest groups like BLM, even those individuals whose conduct resulted in the loss of human life.

80.    The selective non-application of Section 231(a)(3) continued to other leftist riots that erupted post George Floyd, during and beyond the January 6 prosecutions and until this very day. The leftist groups acted and continue to act with impunity, as if somehow certain that they will not be subject to the J6 treatment. These groups are emboldened by the DOJ's passivity in addressing them, and they are encouraged by the DOJ's ruthless prosecution of J6ers, their shared political enemies. Had the DOJ hunted down and prosecuted the leftist groups with the same zeal as they hunted down and prosecuted J6ers, it could have stopped leftist political violence in its tracks.

81.    On November 15, 2023, during what Capitol Police designated an illegal violent protest, Ruben Arthur Camacho slammed a female police officer into a garage door and punched her.[14] Camacho was charged with only misdemeanor assault on a police officer, but the prosecutors agreed to dismiss his charges with prejudice upon six months of good behavior. This stunning case shows that prosecutors had the option to dismiss charges against peaceful, non-violent J6ers for good behavior, but instead hunted them down for four years and charged them to the fullest extent of the law, including holding felony charges over their heads to coerce guilty pleas. The same week that Camacho was arrested, eight (8) J6ers were arrested by FBI agents in New Jersey, Colorado, North Carolina, South Carolina, Texas, Florida, and Ohio. J6 had occurred almost three years prior, yet the DOJ and FBI was still hunting them down, while letting a leftist rioter go free after punching a female police officer.

---

[14] https://www.wusa9.com/article/news/local/dc/us-capitol-police-against-150-people-protesting-dnc-headquarters/65-8e96b297-d1a3-4fcc-8ed0-f8ef84797960.

82.    In Los Angeles in the summer of 2025, insurrectionist activity produced no Section 231(a)(3) charges. Neither were anti-ICE protesters in Minneapolis in the winter of 2025–2026, who physically obstructed law enforcement from carrying out lawful immigration enforcement. As late as June of 2026, protesters at Delaney Hall in Newark, New Jersey are actively obstructing law enforcement operations and have not been charged under Section 231(a)(3). Every one of these protesters, including those standing by peacefully and observing, could be charged by the DOJ under Section 231(a)(3). But this catch-all charge that can be applied to anyone present at a protest has not been applied equally.

83.    Hundreds of J6ers can testify to being threatened with the 1512 and 231 charges. Many were initially charged with misdemeanors but when they refused to plea guilty they were suddenly indicted with the 231 or 1512 charges. Others pled guilty only because of the looming threat of facing 25 years for those two charges.

84.    The 231 and 1512 charges were so overbroad they could be applied to every January 6 defendant and every BLM protestor but they were only brought against one of those groups. These charges were not typical. They were unique to J6ers. Protesting generally was subject to $50 tickets or no punishment at all. But the prosecutors used these charges against J6ers to the exclusion of other protests that were worse by every metric to extract guilty pleas. Accordingly, those guilty pleas should be voided and the prosecutors who extracted them should be investigated.

## THE DC GULAG

85.    The January 6 defendants were not career criminals. They were, by any objective measure, among the most law-abiding cohorts ever prosecuted en masse in the federal system. Many were veterans and law enforcement officers. Many held steady employment. Many had

stable families. They had no prior criminal records, and it goes without saying no history of violence.

86.    Lisa Eisenhart exemplifies the profile. A nurse and mother, after her voluntary surrender to the authorities after January 6, she was initially released pretrial after being assessed by a magistrate in her home state as posing no flight risk and no danger to the community. But the DOJ, in their zealousness to punish J6ers, appealed to the D.C. Court. The DOJ argued that even though she was not a flight risk and presented no conventional danger, she posed a danger to "the fabric of democracy." According to the DOJ, she was an insurrectionist (though not charged with insurrection) and she needed to be locked up in D.C. to await trial. Chief Judge Beryl Howell of the D.C. Court agreed. Eisenhart was transported to Washington and held in the DC Jail—the facility that has since become known among January 6 defendants as the DC Gulag.

87.    She was not alone. Dozens of January 6 defendants—law-abiding Americans assessed by their own communities as safe to release—were brought to the DC Jail and held there in conditions that would soon shock the conscience of federal marshals, members of Congress, and even a D.C. judge.

88.    The horrific conditions in the DC Jail persisted for most of 2021, and were reported in alternative media. But it was ignored by the mainstream media, the DOJ, and the courts until it became unavoidable in the case of J6er Christopher Worrell. Worrell entered the DC Jail with documented non-Hodgkin's lymphoma. In May of 2021, while in the DC Jail, he sustained an injury. Worrell's condition deteriorated while Jail officials ignored medical recommendations, denied him critical medical care, and withheld his medical records until Worrell's attorneys brought the situation before D.C. Judge Royce C. Lamberth.

89.     On October 13, 2021, Judge Lamberth issued an order holding the Warden of the DC Jail and the Director of the D.C. Department of Corrections in contempt of court for failing to provide Worrell with necessary medical care and records. He ordered the Clerk of the Court to transmit a copy of the order to the Attorney General of the United States "for appropriate inquiry into potential civil rights violations of January 6 defendants, as exemplified in this case."

90.     Judge Lamberth's contempt order triggered action by the United States Marshals Service. On October 18, 2021, a USMS inspection team conducted an inspection.

91.     On November 1, 2021, a formal memorandum reported the following findings from the inspection:

- Water and food appeared to be withheld from detainees for punitive reasons. DOC staff confirmed to inspectors that water to cells was routinely shut off as punishment. The water in many cells had been shut off for days, preventing detainees from drinking water, washing their hands, or flushing their toilets.

- Inspectors observed large amounts of standing human sewage in the toilets of multiple occupied cells, with an overpowering smell in many locations.

- Food delivery and storage were inconsistent with industry standards. Hot meals were observed served cold and congealed.

- Evidence of drug use was widespread, with marijuana smoke and odor present throughout the facility.

- Detainees had observable injuries with no corresponding medical or incident reports available to inspectors.

- DOC staff were observed antagonizing detainees during the inspection. Several DOC staff were observed directing detainees not to cooperate with USMS inspectors. One DOC staff member was directly observed telling a detainee to "stop snitching."

- Supervisors appeared unaware or uninterested in any of these issues.

    The memorandum described the situation as a systemic failure.[15]

---

[15] https://www.washingtonpost.com/context/u-s-marshals-service-nov-1-memo-to-d-c-dept-of-corrections-re-d-c-jail-inspection/1ecd5c89-1655-4e86-9ccc-28f432af78c5/

92.    Following the USMS inspection, Representatives Marjorie Taylor Greene and Louie Gohmert sought to conduct their own oversight tour of the DC jail facilities. They had already been denied entry on July 29, 2021, prior to the report, and they were denied again on November 3, 2021, after the report. On November 4, 2021, they finally gained limited access. Rep. Greene's subsequent report, titled "Unusually Cruel: An Eyewitness Report from Inside the DC Jail," documents what they personally observed.[16]

93.    The Greene report details conditions consistent with and in many respects exceeding the USMS findings: cells with residue of human feces, bodily fluids, blood, dirt, and mold; community showers with lingering black mold. Inmates reported to the congressional delegation that they were denied access to attorneys and families, subjected to inadequate nutrition, and subjected to retaliatory treatment—including, according to inmate accounts, being physically assaulted for singing the national anthem. One detainee had been held in solitary confinement for 200 consecutive days. The report raised specific and unanswered questions about allegations that guards had assaulted and otherwise abused of inmates.

94.    Responding to the visit by Rep. Greene and Gohmert, the D.C. City Council conducted its own tour of the DC Jail. At an emergency meeting of the D.C. Council's Committee on the Judiciary and Public Safety, Council members described the conditions as a "crisis," confirming the USMS findings including pervasive marijuana odors and unsanitary conditions throughout the facility.[17] Councilmember Charles Allen observed that guards displayed "callousness" and refused to answer basic questions about inmate health and safety. Witnesses at

---

[16] https://www.govinfo.gov/content/pkg/GOVPUB-Y1_2-PURL-gpo174282/pdf/GOVPUB-Y1_2-PURL-gpo174282.pdf.
[17] https://dc.granicus.com/MediaPlayer.php?view_id=44&clip_id=6919.

the emergency meeting testified that these conditions had persisted for years and had been raised with the director repeatedly, without result.

95.    Witnesses described weekly complaints about inadequate healthcare, with one witness stating that "guards are trying to hurt them" and that inmates "fear for their lives." One witness expressed that the problems were only being exposed because of Greene and Gohmert's advocacy for January 6 detainees—meaning that had it not been for those two members of Congress, the conditions would have remained hidden. The ACLU testified and echoed these remarks, emphasizing that immediate action was needed to address "egregious and inhumane conditions" and the "systemic injustices perpetuated by the District's decades-long carceral approach to public safety."[18] A task force was immediately formed to address the conditions.

96.    In the summer of 2024—three years after the USMS inspection, three years after the D.C. Council declared a crisis, three years after a task force was formed—the DOJ was still sending January 6 defendants pretrial to the DC Jail. On June 7, 2024, while J6 defendants were suffering in the DC Jail, the District Task Force on Jails and Justice released a statement disapproving of the District's proposed jail plan.[19] The Task Force reported that in the preceding seventeen months, seventeen people had died while in the custody of the DC Jail. No satisfactory plan had been presented to cure the systemic failures the USMS had identified in November 2021. The facility that had been declared in crisis in 2021 remained in crisis in 2024. The DOJ knew this. It sent J6 defendants there anyway.

97.    One of them was J6er Benjamen Burlew, a fully disabled combat veteran. He served as an Army Ranger from June 2001 through February 2009, deploying to Iraq and Afghanistan

---

[18] https://www.acludc.org/legislation/aclu-testimony-dc-council-oversight-hearing-department-corrections/.
[19] https://www.courtexcellence.org/news-items/district-task-force-on-jails-justice-statement-disapproving-of-dcs-proposed-jail-plan.

after September 11, 2001. During his service, he was engaged in more than 500 firefights. In 2007, during a firefight in Afghanistan, he broke his back and suffered other severe injuries. He continued fighting for two more years, receiving pain medication to remain in action, with the result that his back fused incorrectly and never properly healed. He was honorably discharged in 2009 and received the Bronze Star Medal with Valor, among a multitude of other commendations and honors. The Department of Veterans Affairs rated him as totally and permanently disabled, including a disability rating for severe PTSD.

98.    Burlew maintained his innocence and refused to plead guilty. He requested that he be allowed to appear remotely from Oklahoma for his pretrial conference and was denied. Due to a series of unfortunate events, he missed one court appearance. Rather than receive a phone call or even notice of a bench warrant, he was arrested without in Oklahoma and dragged across the country to several jails until he arrived at the DC Jail on May 20, 2024—nearly three years after the marshals' report and the judge's contempt order.

99.    When he arrived, Burlew was locked in a small cell for 72 consecutive hours without being let out for any reason. His wife and young children were left in the dark as to his whereabouts or his wellbeing. The cell had no ventilation and felt like it was over 90 degrees. The toilet leaked, leaving a deep pool of toilet water that covered the entire cell floor, rendering the small cot an island in a sea of sewage. Rats scurried through the sewage and water bugs the size of large apricots crawled throughout the cell. He had no change of clothing. He wore the same underwear from May 13 through June 8, 2024. After the initial 72-hour confinement, he was then confined for 23 hours a day to his cell and only allowed one hour a day outside of his cell to shower and/or make a call to his wife and children. On weekends, he was locked down for 72 hours straight. From May 20 through June 10, 2024—21 days—he was never permitted outside. He was

finally permitted outside for one hour on July 2. The next time he was permitted outside was July 23. That is two hours outdoors in sixty days.

100.    He was given no commissary, no medication, no medical attention, no mental health care. He was not given a Bible, despite making repeated requests. He lost approximately 20 pounds. When he mentioned his weight loss to a female lieutenant, she laughed and said: "It's a great weight loss program."

101.    It was during this time at the DC Jail that his court appointed attorney visited him and presented him with an offer from the DOJ to plead guilty. Burlew had demonstrated since his arrest in 2021 that he intended to proceed to trial. But on May 30, 2024, after ten days at the DC Jail, Burlew appeared before the court and pled guilty.

102.    On July 31, 2024, Burlew filed a motion to withdraw his guilty plea arguing that it was entered under duress. The government opposed his motion, arguing that Burlew had sworn under oath that his plea deal was entered voluntarily. The judge denied his motion. Burlew continued to languish in Jail for another 6 months without sentencing until President Trump liberated this disabled veteran on January 20, 2025.

103.    Benjamen Burlew is not an isolated account. His story is confirmed by similar accounts from dozens of January 6 defendants over multiple years. Any guilty pleas entered by defendants who were in the DC Jail are presumptively suspect and should be voided. The circumstances of these detentions should be investigated, as should the prosecutors who knowingly persecuted J6ers, including veterans like Benjamen Burlew.

## DENIAL OF VENUE TRANSFER

104.    The systemic denial of venue transfer motions in January 6 prosecutions did not merely leave defendants in a geographically inconvenient forum. It placed them before jurors in a community that, by every available measure, had prejudged their guilt. Under those circumstances,

the choice to enter a guilty plea was not a free exercise of legal judgment. It was a rational surrender to an impossible situation.

105.    A series of surveys publicly available as exhibits to a multitude of J6 motions to transfer venue show definitively that the District of Columbia was a constitutionally infirm venue for January 6 prosecutions. The DOJ never presented evidence to the contrary. It wasn't necessary because every motion to transfer venue was denied by the D.C. Judges.

106.    The government propaganda demonizing January 6 defendants was so great that many American citizens all over the country prejudged all January 6 defendants as guilty, without hearing any evidence other than the government narrative portrayed widely by the media. But the percentage of those who had prejudged J6ers as guilty was greatest in D.C. Surveys comparing districts found:

- Approximately 71% of D.C. residents surveyed prejudged January 6 defendants as presumptively guilty, compared to 37% in the Middle District of Florida, 48% in the Eastern District of North Carolina, 48% in the Eastern District of Virginia, and 54% in the Middle District of Georgia.

- Approximately 76% of D.C. residents described the events of January 6 as an "insurrection," compared to 55% nationally, 40% in the Middle District of Florida, 52% in the Eastern District of North Carolina, and 57% in the Eastern District of Virginia.

- Approximately 46% of D.C. residents reported being "personally affected" by the events of January 6, compared to fewer than 30% in all other surveyed districts.

- Approximately 47% of D.C. residents reported suffering "inconvenience or restriction on movement" as a result of January 6, compared to approximately 15% in the Eastern District of Virginia and fewer than 10% in the North Carolina and Florida districts.

- Over 66% of D.C. residents experienced heightened concern for their own personal safety or the safety of someone close to them as a result of January 6, compared to fewer than 40% in the Eastern District of Virginia.

107.    Research and analysis of media regarding J6 by region was also instructive. One analysis found that media influence in the District of Columbia was 82% higher than the national average, and that local D.C. media coverage of January 6 accounted for 51% of total media

influence in that market, compared to 11% nationally. Google Trends analysis found that D.C. residents were twice as likely to search for "Capitol Attack" and "Seditious Conspiracy," nearly three times as likely to search for information about the House Select Committee on January 6, and eight times as likely to search for the Committee's final report, compared to the national average.

108.    Taken together, this evidence established what common sense already suggested: D.C. residents viewed January 6 not as a news event but as an attack on their city, their community, and themselves personally. As one prospective juror stated openly during voir dire: "I'm a Washingtonian, born and raised, so, you know, this is my city. I feel violated."

109.    The Attorney General of the District of Columbia agreed that every resident of the District of Columbia was a victim of the events of January 6. The D.C. AG filed a lawsuit against J6 defendants and made a public statement that J6ers threatened the safety of more than 700,000 Americans—including children, families, teachers, and businesses—who call the District home.[20] If this statement is to be taken at face value, then every potential juror and the judges are all victims and should have been stricken or recused. Those who view themselves as victims of the crime cannot be impartial.

110.    The DOJ's and the court's response to the venue evidence was always the same: careful questioning of prospective jurors, combined with the court's instructions to set aside preconceived biased views, would produce an impartial jury. In practice, that meant that any juror, regardless of whatever bias or prejudice was exposed during questioning was still eligible as a fair and impartial juror so long as they assured the judge at the end of questioning that they could put aside their biases and prejudices and be impartial.

---

[20] https://oag.dc.gov/release/ag-racine-files-lawsuit-hold-january-6.

111.    By way of example, a potential juror in one J6 case admitted to having "developed opinions related to the incident on January 6th and the various undemocratic—in my view, undemocratic acts related to that. Election denialism in particular." But this juror also asserted that they could "effectively assess the evidence as presented." Another juror in a different case admitted when questioned that in her personal life she would prejudge a person negatively if the person wore a red MAGA hat, but the juror subsequently answered that for the purposes of trial she could be fair and impartial. The final question had the effect of negating all prior questions; regardless of any openly admitted hostility or bias against J6ers, a juror needed only attest subjectively that they could be impartial. That was sufficient for eligibility to be part of a jury with the power to convict a defendant they admitted to openly despising. J6 jury selection transcripts view countless other examples.

112.    The jury pool in D.C. is also the smallest jury pool of any federal district, making it likely that potential jurors had a direct connection to the Capitol. Potential jurors admitted that they or a close relative or friend worked at the Capitol, for Congress, or had some other close connection to the federal government that resulted in strong negative opinions about January 6ers. No other district in the country would have resulted in so many potential jurors having a personal connection to the incident.

113.    The jury pool is so small that in one case a juror admitted under questioning that she had previously served on another J6 jury. Shockingly, even knowing that the juror had convicted another J6er, the judge did not excuse her.

114.    The government's almost perfect conviction record of January 6 trials in this District corroborated the survey data. J6ers had a reasonable expectation that if they refused to plead guilty and assert their innocence, they would be tried by a jury of D.C. residents who had

prejudged them as guilty and they had 0% chance of success, even if the evidence showed their innocence.

115.    In the face of the survey evidence of jury bias, and the conviction rate of January 6 trials, many defense attorneys advised their J6 clients that trial in this District offered no meaningful chance of acquittal, regardless of the defendants' actual guilt or innocence. The DOJ pressured J6ers to plead guilty by implying or sometimes expressly saying that the chances of a jury acquittal in D.C. were zero. As a result, many J6 defendants pled guilty not because they believed they were guilty, but because they sincerely believed that they were being deprived of their constitutional right to a fair trial. Many of these same defendants would have proceeded to trial if they were permitted to do so in their home states.

## THE TRIAL PENALTY

116.    Built into the architecture of federal prosecutions is a formal mechanism that punishes defendants for exercising their constitutional right to trial. U.S.S.G. § 3E1.1 provides a two-to-three level Guidelines reduction for defendants who "clearly demonstrate acceptance of responsibility." In practice, prosecutors routinely decline to recommend this reduction, and courts decline to apply it, for defendants who opt for trial. The result is a built-in reward for surrendering to the government and a "trial penalty" for those who refuse to surrender.

117.    The trial penalty for J6ers was severe. Overall, Defendants who pled guilty received a sentence substantially shorter than a defendant convicted of identical conduct at trial—not because their conduct was different, but because one had surrendered and the other had not. Every J6 defendant understood the arithmetic: plead and serve months; fight and serve years.

118.    In many cases, the prosecutors expressly threatened more charges and harsher sentences if the defendant opted for the constitutional right to a trial by jury. The trial penalty was

not a subtle inference—it was an explicit feature of plea negotiations communicated to defendants by the DOJ.

119.    J6ers knew about the treatment in the D..C. gulag and that J6ers were being sentenced to years in prison, in some cases decades, even for non-violent offenses. Many J6ers were given a taste of Jail when they were raided by the FBI pre-dawn and detained for hours and sometimes days. They were told that a plea could mean probation instead of prison; days instead of months; months instead of a years, a few years instead of decades. For a January 6 defendant with young children, elderly parents, a job, a business, employees, or a health condition, the threat of years in prison was enough to make them surrender and plead guilty.

120.    J6ers were made aware of the two-tier standard of justice and that the DOJ meant business when they threatened years in prison for even misdemeanor conduct. While Jason Charter received probation for destroying a statute during a BLM riot and Branden Wolfe received 27 months for burning a police station in Minneapolis and looting its weapons, J6er Richard Barnett received 54 months for sitting at a desk and "stealing" a dirty crumpled envelope. They knew that the women who obstructed the official proceeding during the Kavanaugh hearings, including the two women who physically confronted Senator Flake in an elevator[21] and famous comedian Amy Schumer who illegally invaded a Capitol Building, suffered nothing more than a $50 ticket,[22] while J6er Rebecca Lavrenz was fined over $100,000 and sentenced to 6 months of home confinement followed by a year of probation.

121.    Well over 250 January 6 defendants were sentenced to three years or more in prison, with another 300 or more sentenced to less than a year. That does not include the hundreds more that were pending and awaiting sentencing at the time that President Trump liberated them. J6ers

---

[21] https://www.youtube.com/watch?v=bshgOZ8QQxU&t=76s.
[22] https://variety.com/2018/politics/news/amy-schumer-detained-kavanaugh-protest-1202969286/.

understood that the government was seeking harsh sentences in any case, and that the trial penalty would be harsh as well.

122.    The sentencing disparity between defendants who pled and defendants who fought is perhaps most starkly visible in co-defendant cases, where individuals accused of identical conduct received dramatically different charges and sentences depending solely on whether they pled guilty. For instance, in one case, two J6ers peacefully walked in and out of the Capitol, remaining together at all times. They were charged as co-defendants for identical conduct with identical charges, only misdemeanors, no felony indictment. One pled and resolved the matter and was given a relatively light 10-day prison sentence (light by J6 standards; unheard of for similar conduct by BLM standards). The other refused to plead guilty, so the DOJ immediately responded by indicting him with the Section 1512(c)(2) felony. There was no new evidence justifying the addition of a 20-year felony. Nothing changed, other than a refusal to plea. These cases are but one example of the DOJ's routine practice of escalating charges against those who resisted and reducing charges against those who surrendered.

123.    In another case, a J6er charged with only misdemeanors contested the DOJ's overly broad protective order that placed enormous burdens on accessing the global discovery, and preventing crowdsources the evidence which included over 8 million files. Prosecutors responded by adding a felony charge under Section 231(a)(3), without any new evidence.

124.    The following sample of multidefendant J6 cases demonstrate the trial penalty.

- Case No. 1:21-cr-35, there were six co-defendants. Five pled guilty. One opted for trial. The one who went to trial received more than a year more in prison than the next highest-sentenced co-defendant.

- Case No. 1:21-cr-178, three of four co-defendants opted for trial and each received more than four and a half years in prison. The one co-defendant who pled received only two years.

- Case No. 1:21-cr-204, three of four co-defendants pled and received sentences ranging from probation to 45 days. The one who went to trial was sentenced to four years.

- Case No. 1:21-cr-232, the one who pled received 45 days; the one who went to trial received nine months.

- Case No. 1:21-cr-244, one who pled received six months; one who went to trial received nine months.

- Case No. 1:21-cr-246, one who pled was sentenced to four years; one who went to trial was sentenced to twelve years.

- Case No. 1:21-cr-292, one who pled was sentenced to five years; the one who went to trial was sentenced to ten years.

- Case No. 1:21-cr-392, all four who went to trial received prison time; the one who pled received none.

- Case No. 1:21-cr-411, the one who pled received three months; the one who went to trial received eight months.

125. The pattern described compelled a single, inescapable conclusion for every January 6 defendant evaluating their options: accepting the government's plea deal and agreeing to admit to a crime that they didn't commit would result in a shorter sentence. For a person with a children, elderly parents, a job, a business, a health condition, or people who depend on them, there was no meaningful choice. Some heroically resisted and as a result they and their families suffered immeasurably under outrageously disproportionate and unprecedented sentences. But many J6ers succumbed to the unimaginable pressure and made a plea deal with the devil.

126. President Trump is correct. These defendants were frightened and justifiably so. They were frightened by a system that had been carefully constructed by ruthless prosecutors to make resistance irrational and put maximum pressure on J6ers to surrender. The plea agreements that resulted under those conditions are all suspect and should be voided. The prosecutors who engaged in these unprecedented coercive tactics should be investigation. And the Acting Attorney

General—who defended President Trump against weaponization and knows as well as anyone what weaponized federal charging looks like—is uniquely positioned and legally obligated to act.

## CAUSES OF ACTION

### COUNT I: WRIT OF MANDAMUS — 28 U.S.C. § 1361

127.   Plaintiff incorporates by reference all preceding allegations. The Acting Attorney General bears a legally cognizable, non-discretionary duty—grounded in the Fifth Amendment's Due Process Clause, 28 U.S.C. §§ 516, 530B, and the Department's own regulations—to ensure that plea agreements within the federal system were not procured through coercion, duress, or the threat of legally baseless charges. *Fischer v. United States* established that the central charging theory used in hundreds of January 6 cases was legally incorrect. The Acting Attorney General has a plain, non-discretionary duty to: (a) conduct a comprehensive review of all January 6 plea agreements in which Section 1512(c)(2) and/or Section 231(a)(3) were charged or threatened; (b) identify all agreements in which those charges were instruments of coercion rather than legitimate law enforcement; (c) initiate appropriate procedures—including motions to vacate, withdrawal from plea agreements, or other available mechanisms—to provide relief to defendants whose pleas were constitutionally infirm; and (d) investigate and report on the extent of systemic prosecutorial misconduct in the January 6 prosecutions.

### COUNT II: WRIT OF MANDAMUS — 28 U.S.C. § 1651 (ALL WRITS ACT)

128.   Plaintiff incorporates by reference all preceding allegations. The pattern of selective prosecution documented herein—confirmed by the DOJ's own statistical data and illustrated by a catalog of similarly situated comparators who were treated leniently because of their favored political viewpoints—establishes a systemic violation of the Fifth Amendment's equal protection component and the First Amendment's prohibition on viewpoint discrimination in the enforcement

of criminal law. The Acting Attorney General is directed to conduct a formal investigation with particular focus on: (i) the unprecedented and selective deployment of Section 231(a)(3) and Section 1512(c)(2); (ii) the use of charge escalation in response to defendants' exercise of legal rights; (iii) the disparate treatment of January 6 defendants compared to BLM rioters, pro-Palestinian protesters, anti-Ice protestors and other similarly situated individuals holding favored political viewpoints; (iv) any coordination between DOJ personnel and external parties designed to amplify coercive pressure; (v) the scope and nature of government informant and agent activity on January 6, 2021; and (vi) whether federal prosecutors who used legally overbroad charges to compel false official statements themselves violated 18 U.S.C. § 1512(c)(2).

## COUNT III: VIOLATION OF THE FIFTH AMENDMENT — DUE PROCESS AND EQUAL PROTECTION

129.   Plaintiff incorporates by reference all preceding allegations. Guilty pleas induced by the threat of legally overbroad charges—as confirmed by *Fischer* with respect to Section 1512(c)(2), and as established by *Houston v. Hill*, 482 U.S. 451 (1987), are not voluntary in any constitutionally meaningful sense. The prosecution of January 6 defendants under these charges, while similarly or more culpable individuals holding favored political viewpoints were not charged or charged only with misdemeanors, constitutes viewpoint discrimination in violation of the First and Fifth Amendments, and denial of equal protection under the Fifth and Fourteenth Amendments.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Court:

(a) Issue a Writ of Mandamus pursuant to 28 U.S.C. § 1361 and 28 U.S.C. § 1651 directing Respondent Todd Blanche, Acting Attorney General of the United States, to immediately

initiate a comprehensive review of all January 6, 2021 plea agreements in which charges under 18 U.S.C. § 1512(c)(2) and/or 18 U.S.C. § 231(a)(3) were charged or threatened as a condition of plea negotiations;

(b)  Issue a Writ of Mandamus directing Respondent to initiate the legally appropriate procedures—including, where warranted, motions to vacate, withdrawal from plea agreements, or other available mechanisms—to revoke and remedy plea agreements procured through the threatened application of legally invalid or constitutionally overbroad charges, in accordance with *Fischer v. United States* and the constitutional principles set forth herein;

(c)  Issue a Writ of Mandamus directing Respondent to conduct, or cause to be conducted by an appropriate independent authority, a formal investigation into the prosecutorial tactics employed by the Department of Justice under the Biden administration in the January 6 prosecutions, including: (i) the unprecedented and selective deployment of Section 231(a)(3) and Section 1512(c)(2); (ii) the use of charge escalation in response to defendants' exercise of legal rights; (iii) the disparate treatment of January 6 defendants compared to BLM rioters, pro-Palestinian protesters, and other similarly situated individuals; (iv) any coordination between DOJ personnel and external parties designed to amplify coercive pressure on defendants; (v) the scope, nature, and disclosure of government informant and agent activity on January 6, 2021; and (vi) whether federal prosecutors who used legally overbroad charges to compel false statements in official proceedings themselves violated 18 U.S.C. § 1512(c)(2);

(d)  Issue a Declaration pursuant to 28 U.S.C. §§ 2201–2202 that plea agreements in January 6 cases procured through the threatened application of Section 1512(c)(2) under

the theory rejected in *Fischer*, or through the application of Section 231(a)(3) to non-violent conduct, or through a pattern of selective prosecution based on political viewpoint, are constitutionally infirm and require review and remediation;

(e) Award Plaintiff costs of suit; and

(f) Grant such other and further relief as this Court deems just, proper, and consistent with the Constitution and laws of the United States.

Dated: June 11, 2026

Respectfully submitted,

_____

**Jonathan Gross, Esq.**
Law Office of Jonathan Gross
2833 Smith Ave., Suite 331
Baltimore, Maryland 21209
Tel: (443) 813-0141
Email: jonathansgross@gmail.com
**Counsel for Plaintiff**

# EXHIBIT 1

Case 1:26-cv-02082    Document 1    Filed 06/11/26    Page 44 of 50

| | CRIMINAL CASELOAD STATISTICS*<br>JANUARY 6, 2020 THROUGH JANUARY 6, 2022<br>CHARGE 18 USC 1512(c)(2)**<br>DEFENDANTS FILED, CASES FILED | | | CRIMINAL CASELOAD STATISTICS*<br>JANUARY 6, 2020 THROUGH JANUARY 31, 2023<br>CHARGE 18 USC 1512(c)(2)**<br>GUILTY DEFENDANTS*** | |
|---|---|---|---|---|---|
| DISTRICT | DEFENDANTS FILED | CASES FILED | | DISTRICT | GUILTY DEFENDANTS |
| ALABAMA MIDDLE | 0 | 0 | | ALABAMA MIDDLE | 0 |
| ALABAMA NORTHERN | 0 | 0 | | ALABAMA NORTHERN | 0 |
| ALABAMA SOUTHERN | 1 | 0 | | ALABAMA SOUTHERN | 0 |
| ALASKA | 0 | 0 | | ALASKA | 0 |
| ARIZONA | 0 | 0 | | ARIZONA | 0 |
| ARKANSAS EASTERN | 3 | 2 | | ARKANSAS EASTERN | 1 |
| ARKANSAS WESTERN | 0 | 0 | | ARKANSAS WESTERN | 0 |
| CALIFORNIA CENTRAL | 0 | 0 | | CALIFORNIA CENTRAL | 0 |
| CALIFORNIA EASTERN | 0 | 0 | | CALIFORNIA EASTERN | 0 |
| CALIFORNIA NORTHERN | 3 | 3 | | CALIFORNIA NORTHERN | 0 |
| CALIFORNIA SOUTHERN | 0 | 0 | | CALIFORNIA SOUTHERN | 1 |
| COLORADO | 1 | 1 | | COLORADO | 0 |
| CONNECTICUT | 0 | 0 | | CONNECTICUT | 0 |
| DELAWARE | 0 | 0 | | DELAWARE | 0 |
| DISTRICT OF COLUMBIA | 265 | 187 | | DISTRICT OF COLUMBIA | 32 |
| FLORIDA MIDDLE | 0 | 0 | | FLORIDA MIDDLE | 0 |
| FLORIDA NORTHERN | 0 | 0 | | FLORIDA NORTHERN | 0 |
| FLORIDA SOUTHERN | 3 | 1 | | FLORIDA SOUTHERN | 1 |
| GEORGIA MIDDLE | 0 | 0 | | GEORGIA MIDDLE | 0 |
| GEORGIA NORTHERN | 0 | 0 | | GEORGIA NORTHERN | 0 |
| GEORGIA SOUTHERN | 1 | 1 | | GEORGIA SOUTHERN | 1 |
| GUAM | 0 | 0 | | GUAM | 0 |
| HAWAII | 0 | 0 | | HAWAII | 0 |
| IDAHO | 0 | 0 | | IDAHO | 0 |
| ILLINOIS CENTRAL | 0 | 0 | | ILLINOIS CENTRAL | 0 |
| ILLINOIS NORTHERN | 1 | 1 | | ILLINOIS NORTHERN | 0 |
| ILLINOIS SOUTHERN | 0 | 0 | | ILLINOIS SOUTHERN | 0 |
| INDIANA NORTHERN | 0 | 0 | | INDIANA NORTHERN | 0 |
| INDIANA SOUTHERN | 0 | 0 | | INDIANA SOUTHERN | 0 |
| IOWA NORTHERN | 0 | 0 | | IOWA NORTHERN | 0 |
| IOWA SOUTHERN | 0 | 0 | | IOWA SOUTHERN | 0 |
| KANSAS | 0 | 0 | | KANSAS | 0 |
| KENTUCKY EASTERN | 1 | 1 | | KENTUCKY EASTERN | 0 |
| KENTUCKY WESTERN | 0 | 0 | | KENTUCKY WESTERN | 0 |

| | | | | | |
|---|---|---|---|---|---|
| LOUISIANA EASTERN | 1 | 1 | | LOUISIANA EASTERN | 1 |
| LOUISIANA MIDDLE | 0 | 0 | | LOUISIANA MIDDLE | 0 |
| LOUISIANA WESTERN | 0 | 0 | | LOUISIANA WESTERN | 0 |
| MAINE | 0 | 1 | | MAINE | 0 |
| MARYLAND | 2 | 0 | | MARYLAND | 0 |
| MASSACHUSETTS | 3 | 3 | | MASSACHUSETTS | 1 |
| MICHIGAN EASTERN | 0 | 0 | | MICHIGAN EASTERN | 0 |
| MICHIGAN WESTERN | 0 | 0 | | MICHIGAN WESTERN | 0 |
| MINNESOTA | 0 | 0 | | MINNESOTA | 0 |
| MISSISSIPPI NORTHERN | 0 | 0 | | MISSISSIPPI NORTHERN | 0 |
| MISSISSIPPI SOUTHERN | 0 | 0 | | MISSISSIPPI SOUTHERN | 0 |
| MISSOURI EASTERN | 0 | 0 | | MISSOURI EASTERN | 0 |
| MISSOURI WESTERN | 0 | 0 | | MISSOURI WESTERN | 0 |
| MONTANA | 0 | 0 | | MONTANA | 0 |
| NEBRASKA | 0 | 0 | | NEBRASKA | 0 |
| NEVADA | 0 | 0 | | NEVADA | 0 |
| NEW HAMPSHIRE | 0 | 0 | | NEW HAMPSHIRE | 0 |
| NEW JERSEY | 2 | 2 | | NEW JERSEY | 1 |
| NEW MEXICO | 1 | 1 | | NEW MEXICO | 0 |
| NEW YORK EASTERN | 6 | 3 | | NEW YORK EASTERN | 1 |
| NEW YORK NORTHERN | 0 | 0 | | NEW YORK NORTHERN | 0 |
| NEW YORK SOUTHERN | 3 | 4 | | NEW YORK SOUTHERN | 0 |
| NEW YORK WESTERN | 5 | 0 | | NEW YORK WESTERN | 0 |
| NORTH CAROLINA EASTERN | 1 | 0 | | NORTH CAROLINA EASTERN | 0 |
| NORTH CAROLINA MIDDLE | 3 | 2 | | NORTH CAROLINA MIDDLE | 2 |
| NORTH CAROLINA WESTERN | 0 | 0 | | NORTH CAROLINA WESTERN | 0 |
| NORTH DAKOTA | 0 | 0 | | NORTH DAKOTA | 0 |
| NORTHERN MARIANA ISLANDS | 0 | 0 | | NORTHERN MARIANA ISLANDS | 0 |
| OHIO NORTHERN | 0 | 0 | | OHIO NORTHERN | 0 |
| OHIO SOUTHERN | 0 | 0 | | OHIO SOUTHERN | 0 |
| OKLAHOMA EASTERN | 0 | 0 | | OKLAHOMA EASTERN | 0 |
| OKLAHOMA NORTHERN | 0 | 0 | | OKLAHOMA NORTHERN | 0 |
| OKLAHOMA WESTERN | 0 | 0 | | OKLAHOMA WESTERN | 0 |
| OREGON | 0 | 0 | | OREGON | 0 |
| PENNSYLVANIA EASTERN | 1 | 1 | | PENNSYLVANIA EASTERN | 1 |
| PENNSYLVANIA MIDDLE | 0 | 0 | | PENNSYLVANIA MIDDLE | 0 |
| PENNSYLVANIA WESTERN | 1 | 1 | | PENNSYLVANIA WESTERN | 1 |
| PUERTO RICO | 0 | 0 | | PUERTO RICO | 0 |
| RHODE ISLAND | 0 | 0 | | RHODE ISLAND | 0 |
| SOUTH CAROLINA | 4 | 2 | | SOUTH CAROLINA | 4 |
| SOUTH DAKOTA | 1 | 0 | | SOUTH DAKOTA | 1 |
| TENNESSEE EASTERN | 0 | 0 | | TENNESSEE EASTERN | 0 |

| | | | | | |
|---|---|---|---|---|---|
| TENNESSEE MIDDLE | 0 | 0 | | TENNESSEE MIDDLE | 0 |
| TENNESSEE WESTERN | 0 | 0 | | TENNESSEE WESTERN | 0 |
| TEXAS EASTERN | 0 | 0 | | TEXAS EASTERN | 0 |
| TEXAS NORTHERN | 2 | 0 | | TEXAS NORTHERN | 1 |
| TEXAS SOUTHERN | 0 | 0 | | TEXAS SOUTHERN | 0 |
| TEXAS WESTERN | 0 | 0 | | TEXAS WESTERN | 0 |
| UTAH | 2 | 2 | | UTAH | 1 |
| VERMONT | 0 | 0 | | VERMONT | 0 |
| VIRGIN ISLANDS | 0 | 0 | | VIRGIN ISLANDS | 0 |
| VIRGINIA EASTERN | 1 | 1 | | VIRGINIA EASTERN | 1 |
| VIRGINIA WESTERN | 2 | 1 | | VIRGINIA WESTERN | 1 |
| WASHINGTON EASTERN | 1 | 1 | | WASHINGTON EASTERN | 0 |
| WASHINGTON WESTERN | 0 | 0 | | WASHINGTON WESTERN | 0 |
| WEST VIRGINIA NORTHERN | 0 | 0 | | WEST VIRGINIA NORTHERN | 0 |
| WEST VIRGINIA SOUTHERN | 2 | 2 | | WEST VIRGINIA SOUTHERN | 0 |
| WISCONSIN EASTERN | 1 | 1 | | WISCONSIN EASTERN | 0 |
| WISCONSIN WESTERN | 0 | 0 | | WISCONSIN WESTERN | 0 |
| WYOMING | 0 | 0 | | WYOMING | 0 |
| **TOTAL** | **324** | **226** | | **TOTAL** | **53** |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| *Caseload data extracted from the United States Attorneys' Case Management System. | | | | *Caseload data extracted from the United States Attorneys' Case Management System. | |
| **This chart includes data on any and all criminal cases/defendants where 18 U.S.C. 1512(c)(2) was brought as any charge against a defendant. | | | | **This chart includes data on any and all criminal cases/defendants where 18 U.S.C. 1512(c)(2) was brought as any charge against a defendant. | |
| | | | | ***Guilty defendants reflects defendants who were charged with the statute(s) appearing on the chart, and were guilty of at least one statute they were charged with, but not necessarily guilty of the statute(s) appearing on the chart. | |

# EXHIBIT 2

| CRIMINAL CASELOAD STATISTICS* JANUARY 6, 2020 THROUGH JANUARY 6, 2022 CHARGE 18 USC 231** DEFENDANTS FILED, CASES FILED | | | | CRIMINAL CASELOAD STATISTICS* JANUARY 6, 2020 THROUGH JANUARY 31, 2023 CHARGE 18 USC 231** GUILTY DEFENDANTS*** | |
|---|---|---|---|---|---|
| DISTRICT | DEFENDANTS FILED | CASES FILED | | DISTRICT | GUILTY DEFENDANTS |
| ALABAMA MIDDLE | 0 | 0 | | ALABAMA MIDDLE | 0 |
| ALABAMA NORTHERN | 0 | 0 | | ALABAMA NORTHERN | 0 |
| ALABAMA SOUTHERN | 1 | 1 | | ALABAMA SOUTHERN | 1 |
| ALASKA | 0 | 0 | | ALASKA | 0 |
| ARIZONA | 0 | 0 | | ARIZONA | 0 |
| ARKANSAS EASTERN | 0 | 0 | | ARKANSAS EASTERN | 0 |
| ARKANSAS WESTERN | 0 | 0 | | ARKANSAS WESTERN | 0 |
| CALIFORNIA CENTRAL | 0 | 0 | | CALIFORNIA CENTRAL | 0 |
| CALIFORNIA EASTERN | 0 | 0 | | CALIFORNIA EASTERN | 0 |
| CALIFORNIA NORTHERN | 0 | 0 | | CALIFORNIA NORTHERN | 0 |
| CALIFORNIA SOUTHERN | 0 | 0 | | CALIFORNIA SOUTHERN | 0 |
| COLORADO | 0 | 0 | | COLORADO | 0 |
| CONNECTICUT | 0 | 0 | | CONNECTICUT | 0 |
| DELAWARE | 1 | 1 | | DELAWARE | 1 |
| DISTRICT OF COLUMBIA | 206 | 144 | | DISTRICT OF COLUMBIA | 15 |
| FLORIDA MIDDLE | 0 | 0 | | FLORIDA MIDDLE | 0 |
| FLORIDA NORTHERN | 0 | 0 | | FLORIDA NORTHERN | 0 |
| FLORIDA SOUTHERN | 0 | 0 | | FLORIDA SOUTHERN | 0 |
| GEORGIA MIDDLE | 0 | 0 | | GEORGIA MIDDLE | 0 |
| GEORGIA NORTHERN | 0 | 0 | | GEORGIA NORTHERN | 0 |
| GEORGIA SOUTHERN | 0 | 0 | | GEORGIA SOUTHERN | 0 |
| GUAM | 0 | 0 | | GUAM | 0 |
| HAWAII | 0 | 0 | | HAWAII | 0 |
| IDAHO | 0 | 0 | | IDAHO | 0 |
| ILLINOIS CENTRAL | 0 | 0 | | ILLINOIS CENTRAL | 0 |
| ILLINOIS NORTHERN | 2 | 2 | | ILLINOIS NORTHERN | 2 |
| ILLINOIS SOUTHERN | 0 | 0 | | ILLINOIS SOUTHERN | 0 |
| INDIANA NORTHERN | 0 | 0 | | INDIANA NORTHERN | 0 |
| INDIANA SOUTHERN | 0 | 0 | | INDIANA SOUTHERN | 0 |
| IOWA NORTHERN | 0 | 0 | | IOWA NORTHERN | 0 |
| IOWA SOUTHERN | 0 | 0 | | IOWA SOUTHERN | 0 |
| KANSAS | 0 | 0 | | KANSAS | 0 |
| KENTUCKY EASTERN | 0 | 0 | | KENTUCKY EASTERN | 0 |
| KENTUCKY WESTERN | 1 | 1 | | KENTUCKY WESTERN | 0 |

| | | | | |
|---|---|---|---|---|
| LOUISIANA EASTERN | 0 | 0 | LOUISIANA EASTERN | 0 |
| LOUISIANA MIDDLE | 0 | 0 | LOUISIANA MIDDLE | 0 |
| LOUISIANA WESTERN | 0 | 0 | LOUISIANA WESTERN | 0 |
| MAINE | 0 | 0 | MAINE | 0 |
| MARYLAND | 0 | 0 | MARYLAND | 0 |
| MASSACHUSETTS | 2 | 2 | MASSACHUSETTS | 2 |
| MICHIGAN EASTERN | 0 | 0 | MICHIGAN EASTERN | 0 |
| MICHIGAN WESTERN | 0 | 0 | MICHIGAN WESTERN | 0 |
| MINNESOTA | 1 | 1 | MINNESOTA | 1 |
| MISSISSIPPI NORTHERN | 0 | 0 | MISSISSIPPI NORTHERN | 0 |
| MISSISSIPPI SOUTHERN | 0 | 0 | MISSISSIPPI SOUTHERN | 0 |
| MISSOURI EASTERN | 0 | 0 | MISSOURI EASTERN | 0 |
| MISSOURI WESTERN | 0 | 0 | MISSOURI WESTERN | 0 |
| MONTANA | 0 | 0 | MONTANA | 0 |
| NEBRASKA | 0 | 0 | NEBRASKA | 0 |
| NEVADA | 0 | 0 | NEVADA | 0 |
| NEW HAMPSHIRE | 0 | 0 | NEW HAMPSHIRE | 0 |
| NEW JERSEY | 4 | 4 | NEW JERSEY | 3 |
| NEW MEXICO | 0 | 0 | NEW MEXICO | 0 |
| NEW YORK EASTERN | 6 | 5 | NEW YORK EASTERN | 1 |
| NEW YORK NORTHERN | 0 | 0 | NEW YORK NORTHERN | 0 |
| NEW YORK SOUTHERN | 0 | 0 | NEW YORK SOUTHERN | 0 |
| NEW YORK WESTERN | 2 | 2 | NEW YORK WESTERN | 2 |
| NORTH CAROLINA EASTERN | 0 | 0 | NORTH CAROLINA EASTERN | 0 |
| NORTH CAROLINA MIDDLE | 0 | 0 | NORTH CAROLINA MIDDLE | 0 |
| NORTH CAROLINA WESTERN | 0 | 0 | NORTH CAROLINA WESTERN | 0 |
| NORTH DAKOTA | 3 | 3 | NORTH DAKOTA | 3 |
| NORTHERN MARIANA ISLANDS | 0 | 0 | NORTHERN MARIANA ISLANDS | 0 |
| OHIO NORTHERN | 2 | 1 | OHIO NORTHERN | 0 |
| OHIO SOUTHERN | 0 | 0 | OHIO SOUTHERN | 0 |
| OKLAHOMA EASTERN | 0 | 0 | OKLAHOMA EASTERN | 0 |
| OKLAHOMA NORTHERN | 0 | 0 | OKLAHOMA NORTHERN | 0 |
| OKLAHOMA WESTERN | 0 | 0 | OKLAHOMA WESTERN | 0 |
| OREGON | 19 | 19 | OREGON | 2 |
| PENNSYLVANIA EASTERN | 5 | 2 | PENNSYLVANIA EASTERN | 1 |
| PENNSYLVANIA MIDDLE | 0 | 0 | PENNSYLVANIA MIDDLE | 0 |
| PENNSYLVANIA WESTERN | 9 | 8 | PENNSYLVANIA WESTERN | 9 |
| PUERTO RICO | 0 | 0 | PUERTO RICO | 0 |
| RHODE ISLAND | 0 | 0 | RHODE ISLAND | 0 |
| SOUTH CAROLINA | 2 | 2 | SOUTH CAROLINA | 2 |
| SOUTH DAKOTA | 0 | 0 | SOUTH DAKOTA | 0 |
| TENNESSEE EASTERN | 0 | 0 | TENNESSEE EASTERN | 0 |

5

| | | | | | |
|---|---|---|---|---|---|
| TENNESSEE MIDDLE | 0 | 0 | | TENNESSEE MIDDLE | 0 |
| TENNESSEE WESTERN | 0 | 0 | | TENNESSEE WESTERN | 0 |
| TEXAS EASTERN | 0 | 0 | | TEXAS EASTERN | 0 |
| TEXAS NORTHERN | 0 | 0 | | TEXAS NORTHERN | 0 |
| TEXAS SOUTHERN | 1 | 1 | | TEXAS SOUTHERN | 0 |
| TEXAS WESTERN | 0 | 0 | | TEXAS WESTERN | 0 |
| UTAH | 0 | 0 | | UTAH | 0 |
| VERMONT | 0 | 0 | | VERMONT | 0 |
| VIRGIN ISLANDS | 0 | 0 | | VIRGIN ISLANDS | 0 |
| VIRGINIA EASTERN | 0 | 0 | | VIRGINIA EASTERN | 0 |
| VIRGINIA WESTERN | 0 | 0 | | VIRGINIA WESTERN | 0 |
| WASHINGTON EASTERN | 0 | 0 | | WASHINGTON EASTERN | 0 |
| WASHINGTON WESTERN | 1 | 1 | | WASHINGTON WESTERN | 1 |
| WEST VIRGINIA NORTHERN | 0 | 0 | | WEST VIRGINIA NORTHERN | 0 |
| WEST VIRGINIA SOUTHERN | 0 | 0 | | WEST VIRGINIA SOUTHERN | 0 |
| WISCONSIN EASTERN | 1 | 1 | | WISCONSIN EASTERN | 0 |
| WISCONSIN WESTERN | 0 | 0 | | WISCONSIN WESTERN | 0 |
| WYOMING | 0 | 0 | | WYOMING | 0 |
| **TOTAL** | **269** | **201** | | **TOTAL** | **46** |
| | | | | | |
| *Caseload data extracted from the United States Attorneys' Case Management System. | | | | *Caseload data extracted from the United States Attorneys' Case Management System. | |
| **This chart includes data on any and all criminal cases/defendants where 18 U.S.C. 231 was brought as any charge against a defendant. | | | | **This chart includes data on any and all criminal cases/defendants where 18 U.S.C. 231 was brought as any charge against a defendant. | |
| | | | | ***Guilty defendants reflects defendants who were charged with the statute(s) appearing on the chart, and were guilty of at least one statute they were charged with, but not necessarily guilty of the statute(s) appearing on the chart. | |