**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

**J6ERS WERE DESTROYED BY WEAPONIZATION,**

Petitioner,

v.

**TODD BLANCHE,**

Acting Attorney General,

Respondent.

Civil Action No. 1:26-cv-02082

---

**PROPOSED BRIEF OF AMICUS CURIAE CINDY L. YOUNG IN SUPPORT OF PETITIONER**

---



**RECEIVED**

JUN 12 2026

Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

1

TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ........................................... 1

SUMMARY OF ARGUMENT .......................................... 2

ARGUMENT ................................................................
3

    I.    Constitutional Rights Must Remain Meaningful ............. 3

    II.  The Cumulative Pressures Created by the J6 Prosecution System

        A. Defense Counsel's Reluctance... ............................... 4

        B. The Explicit Sentencing Penalty for Lack of Remorse .. 5

        C. Continued Plea Pressure Right Up to Trial ............... 6

        D. Aggressive Government Rhetoric at Sentencing .......... 6

        E. Age, Health, Sobriety, and Insensitive Court-Ordered Conditions ..
7

        F. The Financial, Reputational, and Relational Costs ...... 8

    III. These Pressures Illustrate Why Many Pleas Were Not Voluntary .. 9

CONCLUSION .................................................................
10

DISCLOSURE STATEMENT ..................................................... 11

CERTIFICATE OF SERVICE .................................................... 11

## Cases

Brady v. United States,

397 U.S. 742 (1970)

Bordenkircher v. Hayes,

434 U.S. 357 (1978)

Fischer v. United States,

603 U.S. ___ (2024)

---

## INTEREST OF AMICUS CURIAE

Amicus Curiae Cindy L. Young respectfully submits this brief in support of Petitioner. Amicus is a resident of Bristol, New Hampshire. At the time of the events described herein, she was a sixty-seven-year-old grandmother, breast cancer survivor, retired professional, and small business owner with no prior criminal history and 38 years of continuous sobriety.

Following her voluntary self-surrender on June 23, 2023, in connection with charges arising from January 6, 2021, Amicus entered the federal criminal justice system for the first time. She was initially assigned to Judge Tanya Chutkin. Because of Judge Chutkin's upcoming hearing in the Trump January 6 case, the matter was transferred to Judge Harvey.

Prior to the case being transferred to Judge Harvey, Amicus asked her public defenders to file two specific motions: one for change of venue and one for the removal of the originally assigned judge (Judge Chutkin) due to statements that raised serious concerns about potential bias against January 6 defendants. Her counsel refused to file the requested motions, stating that such motions would be considered "frivolous" and that they would face sanctions for filing them. At a pre-trial hearing before Judge Harvey, the court stated that there would be "no mention" of the First Amendment in his courtroom and no defense of entrapment by estoppel.

Amicus ultimately exercised her constitutional right to a jury trial and was convicted of four misdemeanor offenses in *United States v. Young*, No. 1:23-cr-241 (D.D.C.). She does not seek through this filing to relitigate her criminal case or challenge the validity of the jury's verdict. Rather, she submits this brief because her experiences provide firsthand insight into the practical realities, pressures, and consequences associated with exercising constitutional rights during the January 6

4

prosecutions — pressures that align directly with the coercive tactics identified in the Petition.

Amicus respectfully submits that *the effects of prosecution often extend far beyond incarceration and fines and may include reputational harm, financial loss, social isolation, and the permanent alteration of a person's remaining years.* Because many defendants who accepted plea agreements may no longer have meaningful avenues of review, Amicus believes that preserving the historical record of these experiences serves an important public purpose in support of the relief sought in the Petition.

**SUMMARY OF ARGUMENT**

**The Constitution guarantees citizens the right to trial.** That right fulfills its purpose only when ordinary Americans believe they may exercise it without fearing that the exercise itself will become the source of greater punishment or insurmountable practical barriers.

The Petition identifies four principal coercive tactics that left January 6 defendants with no meaningful choice but to plead guilty: (1) the threat of up to 40 years in prison via overbroad felony statutes; (2) the use of pretrial detention to punish and pressure defendants; (3) the deliberate selection of the District of Columbia, where a fair trial was effectively impossible as evidenced by the 99% conviction rate; and (4) the imposition of disproportionately harsh sentences for those who went to trial or those who accepted the plea agreement.

Amicus's experience as a first-time, elderly defendant who rejected a plea and went to trial illustrates these dynamics in concrete terms. Even for those who chose to fight, the system imposed crushing cumulative pressures — including defense counsel's reluctance to pursue fundamental motions such as change of venue or judicial recusal out of fear of sanctions, judicial limitation of core constitutional

5

defenses, explicit punishment for lack of remorse, ongoing plea pressure right up to trial, and aggressive government rhetoric at sentencing — that compounded the coercion described in the Petition. These pressures made the exercise of constitutional rights extraordinarily costly and, for many similarly situated defendants, practically impossible.

Amicus does not contend that every difficult choice constitutes legal coercion. She respectfully submits, however, that when the cumulative weight of venue bias, perceived judicial predisposition, defense counsel's chilling fear of sanctions, financial ruin, health concerns, and loss of community reaches the point that defendants reasonably perceive they have no meaningful alternative but to surrender their rights, the resulting pleas cannot fairly be deemed voluntary under *Brady v. United States*, 397 U.S. 742 (1970).

## ARGUMENT

### I. Constitutional Rights Must Remain Meaningful

***The Constitution guarantees citizens the right to trial.*** That guarantee serves little purpose if ordinary Americans conclude that exercising that right carries consequences so overwhelming — or barriers so insurmountable — that only those with extraordinary resources or resilience can realistically invoke it.

Plea agreements are a recognized component of the criminal justice system. Not every defendant who pleads guilty does so involuntarily. But constitutional rights are most vulnerable when the cumulative pressures surrounding prosecution become so severe that citizens perceive the exercise of those rights as carrying risks greater than surrendering them. The practical realities frequently extend beyond statutory penalties and include financial ruin, reputational destruction, loss of employment and relationships, deterioration of health, and the irreversible consumption of irreplaceable years.

For elderly defendants and those with significant medical histories, these consequences carry extraordinary weight. The Petition correctly identifies the systemic tactics that magnified these pressures for January 6 defendants. Amicus's experience demonstrates how those tactics operated in practice — even for someone who ultimately went to trial.

## II. The Cumulative Pressures Created by the J6 Prosecution System

Amicus entered the federal criminal justice system for the first time at age sixty-seven. Prior to these events, she had never been arrested or charged with a crime and possessed no familiarity with the federal process.

### A. Defense Counsel's Reluctance to File Fundamental Motions and Judicial Limitation of Constitutional Defenses

Shortly after arraignment, Amicus specifically requested that her public defenders file two motions she believed were essential to a fair process: a motion for change of venue and a motion for the removal of the originally assigned judge (Judge Chutkin) due to statements that raised serious concerns about potential bias against January 6 defendants.

Her counsel refused. They informed Amicus that such motions would be considered "frivolous" and that they would face sanctions for filing them. This response — coming from the very attorneys tasked with zealously representing her — sent a clear message: even core challenges to the fairness of the forum and the assigned judge were effectively off-limits.

At a pre-trial hearing before Judge Harvey (to whom the case had been transferred), the court stated that there would be "no mention" of the First Amendment in his courtroom and no defense of entrapment by estoppel. When defense counsel feel they cannot even *seek* a change of venue or recusal without professional risk, and when the court itself signals at the outset that core constitutional arguments will not be entertained, the already

7

difficult choice to go to trial becomes still more daunting. For many defendants facing similar pressure, accepting a plea — even one they believed was unjust — became the only realistic path to avoid **total destruction.**

This chilling effect on zealous advocacy directly reinforced the Petition's identification of the deliberate selection of the District of Columbia "where a fair trial was effectively impossible" as a coercive tactic.

**B. The Explicit Sentencing Penalty for Lack of Remorse**

When Amicus first met with her public defenders, she made clear that she had no intention of "groveling" to the court, as she believed the charges represented overreach. Her counsel assured her that she would not have to grovel.

At sentencing, however, Judge Harvey explicitly increased the guidelines calculation and imposed a harsher sentence because of what he described as the defendant's lack of remorse:

*"So I have taken all of that into consideration, but that's all set by the defendant's lack of remorse, her failure to sincerely appreciate and understand the seriousness and wrongfulness of her conduct on January 6th. Ms. Young, had you done so, because of your age, I would have been more likely to have placed you on probation or at least imposed a lesser sentence than what I'm going to impose today, but you didn't. You have demonstrated a lack of respect for the law, and it's nothing to be proud of."*

This statement makes the trial penalty explicit: the court penalized Amicus at sentencing specifically because she exercised her right to trial, maintained her position, and did not demonstrate the remorse the court expected. For an elderly defendant, the message was unmistakable — show remorse and accept responsibility (through a plea), or receive a harsher sentence. This

8

directly exemplifies the "disproportionately harsh sentences for those who went to trial" identified in the Petition and the coercive pressure that made many pleas effectively involuntary.

## C. Continued Plea Pressure Right Up to Trial

Just prior to trial, the prosecution offered yet another plea deal. The government told Amicus that she "should accept and stop wasting taxpayer dollars." This final attempt to extract a plea — while framing the exercise of the constitutional right to a jury trial as a waste of public resources — further demonstrates the persistent coercive pressure that continued even as trial approached.

## D. Aggressive Government Rhetoric at Sentencing

**The pressure did not end with the verdict.** At sentencing, the prosecutor who had drafted the original plea offer delivered the following statement:

*"When the dust settles and all that is left is the evidence and the black and the white, history will remember those who had sworn an oath to uphold the Constitution who followed it through, and history will remember Ms. Young as a traitor not only to her own morals, but to this country if she does not accept responsibility."*

This rhetoric from the government at sentencing — directed at a sixty-seven-year-old first-time offender with no criminal history — further illustrates the intense stigmatization and moral condemnation imposed on those who exercised their right to trial. It exemplifies the "disproportionately harsh" treatment for defendants who declined to plead guilty, as described in the Petition.

## E. Age, Health, Sobriety, and Insensitive Court-Ordered Conditions

At sentencing, Amicus was sixty-seven years old, had no criminal history, and was a breast cancer survivor with **38 years of continuous sobriety**. Despite this extensive period of sobriety, the court ordered random urinalysis testing. At sentencing, the court further ordered Amicus to attend addiction classes and placed her under conditions that included an environment noted for high instances of drug and alcohol paraphernalia. These orders disregarded Amicus's long-standing personal circumstances and imposed requirements that were not only unnecessary but potentially harmful. For an elderly first-time offender with decades of sobriety, cancer survivorship, and no substance abuse history, such conditions exemplify the system's failure to meaningfully individualize consequences.

**F. The Financial, Reputational, and Relational Costs**

Having retired from her professional career, Amicus had invested retirement resources into a small business intended to provide financial security in later life. The prosecution substantially disrupted those plans. She incurred significant expenses associated with exercising her constitutional rights, including approximately $6,000 in attorney fees, $4,500 in travel and lodging, $3,600 in transcript expenses, $6,500 in document preparation and litigation support, and appellate filing fees.

Because discovery materials were subject to protective orders, Amicus could not independently review evidence. She was required to travel — often long distances from New Hampshire — to meet with counsel simply to examine portions of the government's case and assist in preparing her defense. Reviewing body camera footage and other video evidence was particularly cumbersome and time-consuming, consuming many hours of counsel's time and generating additional expense. These restrictions created additional

financial, physical, and time burdens on a 67-year-old defendant who was already facing significant stress and health concerns.

Amicus was charged nearly two years after the events of January 6, 2021. By that time, memory of specific details had naturally faded. Efforts to refresh her recollection by revisiting the Capitol required additional court filings and formal approvals, as she was prohibited from entering the District of Columbia without specific permission from the court. These procedural hurdles further complicated and delayed the preparation of an effective defense.

As a grandmother raised in a small, close-knit community on Nantucket Island, Amicus experienced the gradual loss of longstanding friendships and relationships as public narratives intensified. She was ultimately excluded from a class reunion and experienced estrangement from individuals who had played significant roles in her family's life.

The public narratives surrounding January 6 carried profound reputational consequences that no subsequent legal proceeding could fully repair. For many defendants, the greatest fear was not imprisonment itself, but the prospect of spending the remainder of their lives permanently identified by labels they believed did not accurately reflect their conduct.

## III. These Pressures Illustrate Why Many Pleas Were Not Voluntary

The Petition seeks a writ of mandamus directing the Acting Attorney General to review and revoke guilty pleas secured through coercion. Amicus's experience as a defendant who rejected a plea and proceeded to trial illustrates how the cumulative pressures described in the Petition can render such pleas involuntary.

Amicus faced multiple, overlapping barriers to exercising her constitutional rights: defense counsel's refusal to file basic motions for change of venue or judicial recusal out of fear of sanctions; judicial statements at the outset limiting core

11

constitutional defenses; explicit sentencing penalties for lack of remorse; continued plea pressure immediately before trial framed as a waste of taxpayer resources; and court-imposed conditions that disregarded her age, health, and long-term sobriety. These pressures did not operate in isolation. Together, they created a coercive environment in which the practical cost of going to trial became so high that many defendants reasonably concluded they had no meaningful choice but to plead guilty.

Under *Brady v. United States*, 397 U.S. 742 (1970), a guilty plea is involuntary when it is the product of mental coercion that overbears the will of the defendant. The combination of overbroad charging statutes, pretrial detention, a venue widely viewed as hostile, judicial limitations on constitutional arguments, defense counsel's reluctance to challenge the process, and explicit punishment for proceeding to trial created precisely this type of coercive dynamic. Amicus's experience demonstrates how these tactics, when applied cumulatively, can undermine the voluntariness of a plea even for defendants who ultimately chose to go to trial.

**The Constitution guarantees the right to trial.** That right has little meaning if the practical consequences of exercising it are so severe that defendants are effectively forced to surrender it.

## CONCLUSION

Amicus does not seek through this filing to relitigate her criminal case. She respectfully submits that constitutional rights must remain meaningful for ordinary citizens — especially those who are elderly, have significant health concerns, or lack extraordinary resources.

For Amicus, the consequences of prosecution were measured not only in dollars spent or legal outcomes, but in lost relationships, diminished community, depleted

12

resources, and the irreversible passage of irreplaceable time. Those losses cannot be restored by any judgment of this Court.

The systemic tactics identified in the Petition — overbroad charges, pretrial detention, biased venue, harsh trial penalties, and the chilling of zealous advocacy — created precisely the conditions under which many January 6 defendants reasonably concluded they had no meaningful choice but to plead guilty. Preserving the historical record of these experiences and granting the relief sought in the Petition serves the public interest in restoring confidence that the Department of Justice will not again weaponize its power in this manner.

For Amicus, the punishment began long before sentencing. The same was true for countless others who accepted pleas under the pressures the Petition seeks to remedy.

Respectfully submitted,

/s/ Cindy L. Young

Cindy L. Young

Amicus Curiae

Bristol, New Hampshire

13

## DISCLOSURE STATEMENT PURSUANT TO FRAP 29(a)(4)

No party's counsel authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting this brief. No person other than the amicus curiae contributed money that was intended to fund preparing or submitting this brief.

Respectfully submitted,

/s/ Cindy L. Young

Cindy L. Young

14

## CERTIFICATE OF SERVICE

I hereby certify that on this ___ day of June, 2026, I caused a true and correct copy of the foregoing Proposed Brief of Amicus Curiae Cindy L. Young to be served through the Court's CM/ECF system upon all counsel of record.

Respectfully submitted,

/s/ Cindy L. Young

Cindy L. Young